# UNITED STATES *v.* PACIFIC RAILROAD.

# PACIFIC RAILROAD *v.* UNITED STATES.

APPEALS FROM THE COURT OF CLAIMS.

Submitted January 10, 1887. — Decided January 31, 1887.

The United States are not responsible for the injury or destruction of private property caused by their military operations during the late civil war; nor are private parties chargeable for works constructed on their property by the United States to facilitate such operations.

Accordingly, where bridges on the line of a railroad were destroyed during the civil war by either of the contending forces, their subsequent rebuilding by the United States as a measure of military necessity, without the request of, or any contract with, the owner of the railroad, imposes no liability upon such owner.

THESE were appeals from the Court of Claims. The case is stated in the opinion of the court.

*Mr. Attorney General* and *Mr. E. M. Watson* for the United States.

*Mr. John F. Dillon* and *Mr. James Coleman* for the Pacific Railroad Company.

MR. JUSTICE FIELD delivered the opinion of the court.

The Pacific Railroad Company, the claimant in this case, is a corporation created under the laws of Missouri, and is frequently designated as the Pacific Railroad of that state, to distinguish it from the Central Pacific Railroad Company incorporated under the laws of California, and the Union Pacific Railroad Company incorporated under an act of Congress, each of which is sometimes referred to as the Pacific Railroad Company.

From the 14th of August, 1867, to the 22d of July, 1872, it rendered services by the transportation of passengers and freight, for which the United States are indebted to it in the sum of $136,196.98, unless they are entitled to offset the cost of labor and materials alleged to have been furnished by them, at its request, for the construction of certain bridges on the line of its road. The extent and value of the services rendered are not disputed. It is only the offset or charge for the bridges which is in controversy; and that charge arose in this wise: During the civil war, the State of Missouri was the theatre of active military operations. It was on several occasions invaded by Confederate forces, and between them and the soldiers of the Union conflicts were frequent and sanguinary. The people of the state were divided in their allegiance, and the country was ravaged by guerilla bands. The railroads of the state, as a matter of course, were damaged by the contending forces; as each deemed the destruction of that means of transportation necessary to defeat or embarrass the movements of the other. In October, 1864, Sterling Price, a noted Confederate officer, at the head of a large force, invaded the state and advanced rapidly towards St. Louis, approach-

ing to within a few days' march of the city.  During this invasion, thirteen bridges upon the main line and southwestern branch of the company's road were destroyed.  General Rosecrans was in command of the Federal forces in the state, and some of the bridges were destroyed by his orders, as a military necessity, to prevent the advance of the enemy.  The record does not state by whom the others were destroyed; but their destruction having taken place during the invasion, it seems to have been taken for granted that it was caused by the Confederate forces, and this conclusion was evidently correct.  All the bridges except four were rebuilt by the company.  These four were rebuilt by the government, and it is their cost which the government seeks to offset against the demand of the company.  Two of the four (one over the Osage River and one over the Moreau River) were destroyed by order of the commander of the Federal forces.  The other two, which were over the Maramec River, it is presumed, were destroyed by the Confederate forces.

Soon after the destruction of the bridges, and during the same month, General Rosecrans summoned to an informal conference, in St. Louis, several gentlemen regarded as proper representatives of the railroad company, being its president, the superintendent and the engineer of the road, and several of the directors.  The court below makes the following finding as to what there occurred:

" By General Rosecrans it was stated that the immediate rebuilding of the bridges was a military necessity ; that he should expect and require the company to do all in their power to put the roads in working order at the earliest possible moment; and that he intended to have what work they did not do done by the government, and withhold from the freight earnings of the road a sum sufficient to repay the government for such outlays as in law and fact it should be found entitled to have repaid.

" The gentlemen present assured General Rosecrans, that they would do all in their power to rebuild the bridges and put the roads in working order at the earliest moment, but they at the same time represented that several of the bridges,

as they believed, had been destroyed by the proper military authority of the United States, and that in such cases the government was properly responsible for the loss, and should replace the bridges. Those which the public enemy had destroyed they conceded that the company should replace.

"General Rosecrans replied in substance: 'Gentlemen, the question of the liability of the government for repairing damages to this road is one of both law and fact, and it is too early now to undertake the investigation of that question in this stirring time. I doubt myself whether all the damages which you say the government should be responsible for, will be found liable to be laid to the charge of the government. Nevertheless, whatever is fair and right I should like to see done. You tell me now, and I have been informed by some of your representatives individually, that the company's means are insufficient to make these large repairs and make them promptly. Therefore, I want to say to you that, as a military necessity, we must have the work done, and shall be glad to have the company do everything it can, and I will undertake to have the remainder done, and we will reserve out of the freights money enough to make the government good for that to which it shall be found to be entitled for rebuilding any or all of the bridges, and we will return the freights to you or settle with you on principles of law and equity.'

"The gentlemen interested in the company reiterated their view of the case, that the company should pay for bridges destroyed by the public enemy, and that the government should replace at its own cost the bridges destroyed by its own military authorities."

The court also finds that these mutual representations and assurances were not intended or understood on either side to form a contract or agreement binding on the government or the company; that no formal action upon them was taken by the board of directors; and that there was no proof that they were ever communicated to the directors, except as may be inferred from subsequent facts and circumstances mentioned; but that the company, through its directors and officers, promptly exerted itself, to its utmost power, to restore the

roads to running order, and to that end coöperated with the government.

At the same time, General Rosecrans informed-the Secretary of War that the rebuilding of the bridges was "essential, and a great military necessity " in the defence of the state, and requested that Colonel Myers should be authorized, "to have them rebuilt at once, the United States to be reimbursed the cost out of freight on the road." The Secretary referred the matter to the Quartermaster General, who recommended that General McCallum, Superintendent of Military Roads, be directed to take the necessary measures immediately for that purpose. The Secretary approved the recommendation, and General McCallum was thereupon ordered to cause the bridges to be rebuilt by the quickest and surest means possible. It does not appear that the company had any notice of these communications or of the order.

The bridge over the Osage River was destroyed on the 5th of October, 1864, by order of the officer commanding the central district of Missouri, acting under instructions from General Rosecrans to "use every means in his power to prevent the advance of the enemy." The court finds that the destruction was ordered for that purpose, and that the exigency appeared to the officer, and in fact was, of the gravest character, and an imperative military necessity. The government rebuilt the bridge, at an expense of $96,152.65; and this sum it seeks to charge against the company.

The bridge across the Moreau was also destroyed by command of the same officer, under the same military exigency. The company commenced its reconstruction, but, before it was completed, the work was washed away by a freshet in the river. The government afterwards rebuilt it at an expense of $30,801; and this sum it also seeks to charge against the company.

The two bridges across the Maramec were destroyed during the invasion, as already stated, but not by the forces of the United States. They were, however, rebuilt by the government as a military necessity, at an expense of $54,595.24; and this sum, also, it seeks to charge against the company. The

Court of Claims allowed the cost of three of the bridges to be charged against the company, but rejected the charge for the fourth — the one over the Osage River. The United States and the claimant both appealed from its judgment; the claimant, because the cost of the three bridges was allowed; the United States, because the charge for one of the four was disallowed.

The cost of the four bridges rebuilt by the government amounted to $181,548.89. The question presented is, whether the company is chargeable with their cost, assuming that there was no promise on its part, express or implied, to pay for them. That there was no express promise is clear. The representations and assurances at the conference called by General Rosecrans to urge the rebuilding of the bridges were not intended or understood to constitute any contract: and it is so found, as above stated, by the court below. They were rebuilt by the government as a military necessity to enable the Federal forces to carry on military operations, and not on any request of or contract with the company. As to the two bridges destroyed by the Federal forces, some of the officers of the company at that conference insisted that they should be rebuilt by the government without charge to the company, and, though they appeared to consider that those destroyed by the enemy should be rebuilt by the company, there was no action of the board of directors on the subject. What was said by them was merely an expression of their individual opinions, which were not even communicated to the Board. Nor can any such promise be implied from the letter of the president of the company to the Quartermaster General in November, subsequent to the destruction of the bridges, informing him that the delay of the War Department in rebuilding them had prompted the company to "unusual resources"; that it was constructing the bridges over the Gasconade and the Moreau Rivers, and that the only bridge on the main line to be replaced by the government was the one over the Osage River, the company having replaced all the smaller, and was then replacing all the larger ones. The letter only imparts information as to the work done and to be done in rebuilding the bridges

on the main line. It contains no promise, as the court below seems to have thought, that, if the government would rebuild the bridge over the Osage River, it should be reimbursed for any other it might rebuild on the main line of the company. Nor do we think that any promise can be implied from the fact that the company resumed the management and operation of the road after the bridges were rebuilt; but on that point we will speak hereafter. Assuming, for the present, that there was no such implication, we are clear that no obligation rests upon the company to pay for work done, not at its request or for its benefit, but solely to enable the government to carry on its military operations.

It has been held by this court in repeated instances that, though the late war was not between independent nations, yet, as it was between the people of different sections of the country, and the insurgents were so thoroughly organized and formidable as to necessitate their recognition as belligerents, the usual incidents of a war between independent nations ensued. The rules of war, as recognized by the public law of civilized nations, became applicable to the contending forces. Their adoption was seen in the exchange of prisoners, the release of officers on parole, the recognition of flags of truce, and other arrangements designed to mitigate the rigors of warfare. The inhabitants of the Confederate States on the one hand, and of the states which adhered to the Union on the other, became enemies, and subject to be treated as such, without regard to their individual opinions or dispositions; while during its continuance commercial intercourse between them was forbidden, contracts between them were suspended, and the courts of each were closed to the citizens of the other. *Brown* v. *Hiatts*, 15 Wall. 177, 184.

The war, whether considered with reference to the number of troops in the field, the extent of military operations, and the number and character of the engagements, attained proportions unequalled in the history of the present century. More than a million of men were in the armies on each side. The injury and destruction of private property caused by their operations, and by measures necessary for their safety and

efficiency, were almost beyond calculation. For all injuries and destruction which followed necessarily from these causes no compensation could be claimed from the government. By the well settled doctrines of public-law it was not responsible for them. The destruction or injury of private property in battle, or in the bombardment of cities and towns, and in many other ways in the war, had to be borne by the sufferers alone as one of its consequences. Whatever would embarrass or impede the advance of the enemy, as the breaking up of roads, or the burning of bridges, or would cripple and defeat him, as destroying his means of subsistence, were lawfully ordered by the commanding general. Indeed, it was his imperative duty to direct their destruction. The necessities of the war called for and justified this. The safety of the state in such cases overrides all considerations of private loss. *Salus populi* is then, in truth, *suprema lex.*

These views are sustained in treatises of text-writers, by the action of Congress, and by the language of judicial tribunals. *Respublica* v. *Sparhawk*, 1 Dall. 357; *Parham* v. *The Justices*, 9 Geo. 341; *Taylor* v. *Nashville & Chattanooga Railroad*, 6 Coldwell, 646; *Mayor* v. *Lord*, 18 Wend. 126.

Vattel, in his Law of Nations, speaks of damages sustained by individuals in war as of two kinds — those done by the state and those done by the enemy. And after mentioning those done by the state deliberately and by way of precaution, as when a field, a house, or a garden, belonging to a private person, is taken for the purpose of erecting on the spot a town rampart or other piece of fortification; or when his standing corn or his storehouses are destroyed to prevent their being of use to the enemy; and stating that such damages are to be made good to the individual, who should bear only his quota of the loss, he says: "But there are other damages, caused by inevitable necessity, as, for instance, the destruction caused by the artillery in retaking a town from the enemy. These are merely accidents; they are misfortunes which chance deals out to the proprietors on whom they happen to fall. The sovereign, indeed, ought to show an equitable regard for the sufferers, if the situation of his affairs will admit of it; but *no*

*action* lies against the state for misfortunes of this nature —
for losses which she has occasioned, not wilfully, but through
necessity and by mere accident, in the exertion of her rights.
The same may be said of damages caused by the enemy.   All
the subjects are exposed to such damages; and woe to him
on whom they fall!   The members of a society may well
encounter such risk of property, since they encounter a similar
risk of life itself.   Were the state strictly to indemnify all,
those whose property is injured in this manner, the public
finances would soon be exhausted, and every individual in the
state would be obliged to contribute his share in due propor-
tion, a thing utterly impracticable."[1]   Book III, c. 15, §
232.

Three cases in Congress, one before the House of Repre-
sentatives in 1797, and two before the Senate, one in 1822 and
one in 1872, illustrate this doctrine.   In the first of these, a
Mr. Frothingham, of Massachusetts, presented a petition to
the House of Representatives, asking compensation for a
dwelling-house, the property of his mother, burned at Charles-
town, in March, 1776, by order of General Sullivan, then
commanding the American troops at that place.   The Com-
mittee on Claims, to whom it was referred, made a report
that they found that the house for which compensation was
sought was, with several other buildings in the vicinity, at
that time in possession of the British troops; and that, for

---

[1] Mais d'autres dommages sont causés par une nécessité inévitable: tels
sont, par exemple, les ravages de l'artillerie, dans une ville que l'on reprend
sur l'ennemi.   Ceux-ci sont des accidents, des maux de la for'une, pour les
propriétaires sur qui ils tombent.   Le souverain doit équitablement y avoir
égard, si l'état de ses affaires le lui permet; mais on n'a point d'action con-
tre l'État pour des malheurs de cette nature, pour des pertes qu'il n'a point
causeés librement, mais par nécessité et par accident, en usant de ses droits.
J'en dis autant des dommages causés par l'ennemi.   Tous les sujets sont
exposés à ces dommages; malheur à celui sur qui ils tombent!   On peut bien,
dans une société, courir ce risque pour les biens, puisqu'on le court pour
la vie.   Si l'État devait à la rigueur dédommager tous ceux qui perdent de
cette manière, les finances publiques seraient bientôt épuisés; il faudrait
que chacun contribuât du sien, dans une juste proportion; ce qui serait im-
praticable.   Vattel Droit des Gens, Liv. 3, c. 15, § 232; Vol. 3, p. 115, ed.
Pradier-Fodéré, Paris, 1863.

the purpose of dislodging them, the general sent .a party of troops with orders to set fire to the buildings, which was done accordingly ; and that they apprehended that the loss of houses and other sufferings by the general ravages of war had never been compensated by this or any other government; that in the history of our Revolution, sundry decisions of Congress against claims of this nature might be found; and that the claim presented rested upon the same basis with· all others where sufferings arose from the ravages of war. As the government had not adopted a general rule to compensate individuals who had suffered in a similar manner, the committee were of opinion that the prayer of the petitioner could not be granted; and no further action was had upon the claim. American State Papers, Class XIV, Claims, p. 199.

In the second of ·the cases referred to, a Mr. Villiers, of Louisiana, presented a petition to the House of Representatives, stating that during the invasion of the British in 1814–15, after the enemy had landed near the city of New Orleans, in order to prevent him from bringing up his cannon and other ordnance to the city, General Morgan, commanding the Louisiana militia, caused the levee to be cut through, at or near the plantation of the petitioner, whereby the greater part of his plantation was inundated, and remained so till after the departure of the invading army from the state; that in consequence the petitioner had suffered great losses in the destruction of his sugar cane, cane plants, and in the expenses of repairing the levee, appraised at $19,250 ; for which he prayed compensation. The Committee on Claims, to whom the petition was referred, recommended that its prayer should not be granted, on the ground that the losses were sustained in the necessary operations of war, for which the United States were not liable; and their recommendation was adopted. American State Papers, Class XIV, Claims, p. 835; Annals of Congress, 17th Cong., 1st Sess., Part 1, p. 311.

The third of the cases referred to is that of J. Milton Best, which was much discussed in the Senate. His claim was for the value of a dwelling-house and contents destroyed by order of the officer commanding the Union forces in defence of the

city of Paducah, Kentucky, in March, 1864. The city being attacked by the Confederates in force, the Federal troops, numbering seven hundred, were withdrawn into Fort Anderson. The claimant's house, which was about one hundred and fifty yards from the fort, was taken possession of by the sharpshooters of the enemy, who did great execution picking off men at the guns within the defences. They were driven from the house by shells from the fort and gunboats, and late that night the Confederates retired from their assault without success. They appeared with reinforcements the next morning, and the Union officer, regarding his command in great peril, his ammunition being nearly exhausted, gave orders for the destruction of all houses within musket-range of the fort. The claimant's loyalty was unquestioned. The officers in command at the post from time to time during the war testified to his reliability and the effective aid he rendered the Union cause.

The Senate Committee on Claims reported the case as one presenting the "simple question of who shall pay for the destruction of a loyal citizen's property, destroyed by the order of a commanding officer to save his imperilled army, at the claimant's home, a place never in possession of the enemy, and in a nonseceding state." Upon this question they say: "It appears to your committee that the facts establish a just claim against the government for private property taken and destroyed to prevent a greater destruction of its own property and the massacre of its troops."

They reported that "the injuries to the claimant's house, by shelling out the rebels in the battle of the 25th of March [the day preceding the destruction of the property], may be regarded as a casualty by the general ravages of war, which might properly be deducted from the amount of loss proved by claimant," and they made what they deemed a proper deduction on that account in the bill presented by them for the payment of the damages. The bill was intended to cover the value of his property at the time it was burned to prevent its use by the reinforced enemy on the following day. In the debate which followed, it was contended by advocates of the bill, that while the damage by shelling from our own fort

during the battle came within the ravages of war, the subsequent burning of the house to prevent its being used by the sharpshooters of the enemy was a taking by the government of private property for public use, for which compensation should be made.

The bill passed in the Senate January 5, 1871, but was not acted upon by the House during that Congress. It again passed in the Senate, April 8, 1872, and in the House, May 18, 1872. It was vetoed by the President June 1, 1872. In his message to the Senate the President, after speaking of the claim as one for compensation on account of the ravages of war, and observing that its payment would invite the presentation of demands for very large sums of money against the government for necessary and unavoidable destruction of property by the army, said: "It is a general principle of both international and municipal law that all property is held subject, not only to be taken by the government for public uses, in which case, under the Constitution of the United States, the owner is entitled to just compensation, but also subject to be temporarily occupied, or even actually destroyed, in times of great public danger, and when the public safety demands it; and in this latter case governments do not admit a legal obligation on their part to compensate the owner. The temporary occupation of, injuries to, and destruction of property caused by actual and necessary military operations, is generally considered to fall within the last-mentioned principle. If a government makes compensation under such circumstances, it is a matter of bounty rather than of strict legal right." Cong. Globe, 42d Cong., 2d Sess., Part V, p. 4155.

The message was referred to the Committee on Claims, and on the 7th of February, 1873, it was reported back with a recommendation that the bill be passed, the objections of the President to the contrary notwithstanding. On the 24th of the same month, the bill was reached on the calendar and was passed over upon objection. No further action was ever taken upon it in the Senate, and consequently it never reached the House.

The claim has been repeatedly presented to Congress since,

but has never been considered by either House. The principle that, for injuries to or destruction of private property in necessary military operations during the civil war, the government is not responsible is thus considered established. Compensation has been made in several such cases, it is true; but it has generally been, as stated by the President in his veto message, " a matter of bounty rather than of strict legal right."

In what we have said as to the exemption of government from liability for private property injured or destroyed during war, by the operations of armies in the field, or by measures necessary for their safety and efficiency; we do not mean to include claims where property of loyal citizens is taken for the service of our armies, such as vessels, steamboats, and the like, for the transport of troops and munitions of war; or buildings to be used as storehouses and places of deposit of war material, or to house soldiers or take care of the sick, or claims for supplies seized and appropriated. In such cases, it has been the practice of the government to make compensation for the property taken. Its obligation to do so is supposed to rest upon the general principle of justice that compensation should be made where private property is taken for public use, although the seizure and appropriation of private property under such circumstances by the military authorities may not be within the terms of the constitutional clause. *Mitchell* v. *Harmony*, 13 How. 115, 134; *United States* v. *Russell*, 13 Wall. 623.

While the government cannot be charged for injuries to, or destruction of, private property caused by military operations of armies in the field, or measures taken for their safety and efficiency, the converse of the doctrine is equally true, that private parties cannot be charged for works constructed on their lands by the government to further the operations of its armies. Military necessity will justify the destruction of property, but will not compel private parties to erect on their own lands works needed by the government, or to pay for such works when erected by the government. The cost of building and repairing roads and bridges to facilitate the movements of troops, or the transportation of supplies and munitions of war, must, therefore, be borne by the government.

It is true that in some instances the works thus constructed may, afterwards, be used by the owner; a house built for a barrack, or for the storage of supplies, or for a temporary fortification, might be converted to some purposes afterwards by the owner of the land, but that circumstance would impose no liability upon him. Whenever a structure is permanently affixed to real property belonging to an individual, without his consent or request, he cannot be held responsible because of its subsequent use. It becomes his by being annexed to the soil; and he is not obliged to remove it to escape liability. He is not deemed to have accepted it so as to incur an obligation to pay for it, merely because he has not chosen to tear it down, but has seen fit to use it. *Zottman* v. *San Francisco*, 20 Cal. 96, 107. Where structures are placed on the property of another, or repairs are made to them, he is supposed to have the right to determine the manner, form, and time in which the structures shall be built, or the repairs be made, and the materials to be used; but upon none of these matters was the company consulted in the case before us. The government regarded the interests only of the army; the needs or wishes of the company were not considered. No liability, therefore, could be fastened upon it for work thus done.

We do not find any adjudged cases on this particular point; whether the government can claim compensation for structures erected on land of private parties, or annexed to their property, not by their request, but as a matter of military necessity, to enable its armies to prosecute their movements with greater efficiency; and we are unable to recall an instance where such a claim has been advanced.

It follows from these views, that the government can make no charge against the railroad company for the four bridges constructed by it from military necessity. The court will leave the parties where the war and the military operations of the government left them.

*The judgment of the Court of Claims must, therefore, be reversed, and judgment be entered for the full amount claimed by the railroad company for its services; and it is so ordered.*

*United States* v. *Atlantic and Pacific Railroad Company.* Same counsel as in the last case. Mr. Justice Field delivered the opinion of the court. It is agreed by counsel of the parties that this case involves the same question as that decided in *United State* v. *Pacific Railroad*, and, therefore, on the authority of that decision, the judgment below is

*Affirmed.*