Davis, J.,
delivered tbe opinion of the court:
This is a claim for loss sustained by a freighter across the plains, through the alleged impressment of his trains by order of Colonel Albert Sidney Johnston, during the Utah expedition of 1857.
The case comes to us by virtue of the provisions of the following act of Congress, approved July S, 1S8C:
“ That the claims of Joseph C. Irwin & Co., and C. A. Perry & Co., freighters, for property claimed toha.ve been taken and impressed into the service of the United States in the year 1857, by orders of Col. Albert Sidney Johnston, in commaud of the Utah expedition, as well as for property alleged to have been sold to the G-overnment, be, and the same are hereby, referred, with all the papers relating thereto, to the Comb of Claims for adjudication according to law, on the proofs heretofore presented and such other proofs as may be adduced, and report the same to Congress.” ,
Our first duty is to ascertain the nature and extent of the jurisdiction conferred upon this court by the act. The controlling word is “ adjudication; ” the claims are referred here for “adjudication,” and for adjudication “according to law.” If this were all there would be no difficulty in the solution of the intent of the statute, and we should immediately consider ourselves authorized to proceed to judgment, from which an appeal would in due course lie to the Supreme Court.
The question, however, is complicated by the addition at the end of the statute of the words “ and report the same to Congress.” These words, it is urged, destroy the power to enter final judgment and place the court in a position analogous to that occupied by them in cases referred under the Bowman Act, 1883, wherein we act simply in aid of the Congress, and have not judicial power. If this contention be correct, the force and effect of the word “adjudicate” is destroyed. That word is evidently carefully selected, and must be assumed to have been chosen by the law-makers with deliberate intent that we should give to it the full legal effect to which it is entitled. That legal effect is to hear these claims upon the evidence, to enter judgment thereupon from which an appeal will lie, and not simply to prepare for the advice of Congress and in aid of that body a report which carries with it no definite legal result.
To adjudicate is to give judgment; an adjudication is a set *155 tlement by judgment; and a judgment in its nature is a conclusion of litigation. A hearing and report to the Congress in a manner substantially advisory only is in no judicial sense a finality, but is a mere transfer back to the legislature of the power to settle.
Every judgment of this court is reported to the Congress (sec. 1057, Rev. Stat.); this report is not understood to be in its nature advisory, but to be a method prescribed to us by the Congress of informing that body of the debts found due in course of law by the United States to individuals, in order that provision may be made for their payment.
In practice, the judgments of this court are regarded as finalities, they have never been repudiated as “ adjudications according to law,” and the Congress, of course, had this in view when the statute under discussion was passed; the language appearing in it must be read with this understanding.
Weattachto the words “report to Congress” only this effect, that the judgment is in due course to be reported to Congress, as are other judgments, and that this case is to receive through the special act no different or greater or less advantages, if such there be, than those which pertain to other successful litigants within this jurisdiction.
“ Keport the same to Congress,” in our opinion, means no more than that wo are to report the result of the “adjudication according to law” directed by the Congress to be made. We are not to certify our opinion to the Congress, nor are we to report it to any other officer or Department of the Government, and the ease, having once been “ adjudicated” here, will be (subject of course to revision by the Supreme Court) as finally settled as is any other case falling within our jurisdiction, all of which are reported to Congress.
In Gordon1 s Case (117 U. S. R., p. 697.) the objection taken by the learned Chief-Justice to the finality of the decision was based upon clauses of the statute of 1863, which required all judgments rendered by this court to be presented to the Secretary of the Treasury, and provided that they should not'be paid until “after an appropriation therefor shall be estimated for by the Secretary of the Treasury.” Under this state of the law, said the Chief-Justice, “The real and ultimate judicial power will be exercised by the legislative department, and not by that department to which the Constitution has confided it.” *156 (P. 703.) That is, the judgment depended for its enforcement first upon an estimate by the Secretary of the Treasury; second, upon an appropriation by the Congress, and therefore was not final.
This feature of the act of 1863 was repealed in 1866, and soon after the case of De Groot was carried to the Supreme Court. (5 Wall., 419.)
That case came to the Court of Claims under a special act, directing the Secretary of War to transmit all papers relating to the case “to the Court of Claims for adjudication,” and the Supreme Court entertained an appeal under this phraseology of the special act. That is, the court necessarily held that “ adjudication” involved entry of judgment.
Atocha’s claim (17 Wall., 439) grew out of treaty stipulations, and was, therefore, not within the general jurisdiction of this court. A special act sent it here, and after decision an application to the Supreme Court for a mandamus was refused, upon the ground that the authority of this court to hear and determine the claim, and the authority of the Supreme Court to review the action below, were limited and controlled by the special act, and as that act directed the Court of Claims to make “a specific examination into the justice of the claim against Mexico,”and whether “it was embraced within the treaty,” and if of opinion that it was just and embraced within the treaty, then “ to fix and determine” its amount, such determination was final. The Supreme Court, however, noted the distinction between the phraseology of the Atocha act and that for the benefit of Meade (14 Stat. L., 611), which referred a claim to this court “ for adjudication thereof pursuant to authority conferred upon said court by any existing law to examine and decide claims against the United States referred to it by Congress,” phraseology which seems to us equivalent in legal effect to that used in the special act now under consideration, to wit: “For adjudication according to law.”
The Congress, thoroughly familiar with these rulings of the Supreme Court, used the language of the special act advisedly and carefully, and we conclude that they intended us to enter judgment in this case, and to report that fact to the Congress, as we do in other cases.
Having decided that we are to “ adjudicate,” that is, to find a judgment, “ according to law,” we must turn again to the act *157 for tbe purpose of discovering the precise question submitted to us. It is the claims of certain individuals for property alleged to have been “ taken and impressed into the service of the United States ” at a time fixed, under an order specified, “ as well as for property alleged to have been sold to the Government.” The last clause is simple of construction and clearly refers to the same transaction. In fact there is no contention to the contrary. We are then presented with this question: Was plaintiffs’ property “ taken and impressed into the service of the United States'?”
It appears from the findings that while proceeding across the plains with trains laden with merchandise, carried under a contract of affreightment, and destined for delivery to individuals in Salt Lake City, plaintiffs were halted within something over 200 miles of their destination by order of an officer commanding United States troops. The Mormons were then in a hostile attitude against the United States, and these troops were engaged in the duty of enforcing the peace. Plaintiffs were detained with the column, and, as a necessary result, not only did they not reach Salt Lake City at all, but they lost a large amount of property, mostly beasts of burden, which died from fatigue, exposure, and insufficient food. The column finally, after much hardship, arrived at Fort JBridger, and did not proceed farther that winter, and there much of plaintiffs* property was taken for the use of the Army. As to this last item there can be little dispute; the real contention turns upon the death of oxen and horses and other losses incident to the detention by military command.
“ Impressment” has been defined as a taking into the public service by compulsion (10 Op. Atty. Gen’l, p. 24), and “ service” as the voluntary or involuntary subjection of one’s conduct to the control of another for the benefit of another {Ibid.).
The primary object of Colonel Johnston’s order was not for the protection of plaintiffs; they did not ask it; on the contrary, they requested permission to proceed. Whatever their feelings may have been, as patriotic citizens, in the strife then progressing, as freighters they could have no object in delaying a delivery into Mormon hands of goods which the Mormons would be glad to receive, and which the freighters were under contract to carry with reasonable expedition to their destination in Salt Lake City. On the other hand, it was the duty of *158 the military commander to prevent any increase of the enemy’s supplies, and for this purpose he very properly detained all trains bound westward. In the performance of his military duty the commander stopped these trains, forced them into his column, placed them under military discipline, ordered them as t.o their participation in defense against a possible attack, and finally made direct use for the benefit of the Army of the freighters’ property.
It is a question whether the loss of beasts of burden due to the delay was a destruction of private property caused by military operations (United States v. Pacific R. R., 120 U. S. 227), or a loss arising from the necessary taking into public service of private property upon compulsion.
The commander directed that no goods or supplies should pass the Army for points occupied by the Mormons, and that no communication whatever should be held with them so long as they maintained a hostile attitude. In the then position of affairs this was a reasonable and necessary military order. Colonel Johnston would, it seems to us, have failed in his duty. had he allowed supplies to go forward to the enemy he was ordered to quell.
The train was placed under military control; it was delayed; its stock was used to some-extent in direct aid of the Government teams. As an immediate result of the military action plaintiffs’ loss occurred. To be sure, this loss — we are now speaking more particularly of the death and deterioration of stock — was not a benefit to the Government, on the contrary; but the detention which was the direct cause of the loss was a most substantial advantage to it.
Mitchell against Harmony, to which we are cited as an authority against plaintiff’s contention, seems hardly in point, for there the court held that there was no emergency which justified the taking. “ It is the emergency which gives the right, and the emergency must be shown to exist before the taking can be justified.” (13 Howard, p. 134.) - -
In United States against Bussell the doctrine of Mitchell against Harmony was affirmed, the court using this language when speaking of a taking by imperative military necessity:
“ Such a taking of private property by the Government when the emergency of the public service in time of war or impending public danger is too urgent to admit of delay, is *159 everywhere regarded as justified, if the necessity for the use of the property is imperative and immediate, and the danger as heretofore described is impending; and it is equally clear that the taking of such property under such circumstances creates an obligation on the part of the Government to re-imburse the owner to the full value of the service. Private rights under such extreme and imperious circumstances must give way for the time to the public good, but the Government must make full restitution for the sacrifice. (13 Wall., p. 623.)”
Any doubts which might remain as to the legal effect of Colonel Johnston’s order are cleared away by a legislative and an executive construction directly in point. The Porters were freighters like the Irwins; like the latter they were stopped at Eocky Eidge and subjected to the same treatment and to similar loss. Their claim coming before the Attorney-General he held (10 Op., p. 21).
£l So far as the papers show it is not denied by anybody that the facts proved make out a strong case against the Government for compensation for these losses, for it is evident that the order of General Johnston, and the military control established by him over this train, which we have seen were the cause of its loss, were the wise and proper precautions of an officer to protect his own force and prevent his enemy from being strengthened.”
In February, 1887, an act was passed authorizing the Secretary of the Treasury to pay the Porters a sum named “ in full for all claims for damages or compensation for property impressed by order of Colonel Johnston in command of the United States troops en route for Utah in 1857.” (24 Stat. at L., p. 900.)
During a previous session of the same Congress (24 Stat. at U., p. 128) was passed the act now under consideration, which referred to us plaintiffs’ claim for property “ taken and impressed into the service of the United States in the year 1857, by orders of Col. Albert Sidney Johnston, in command of the Utah expedition, as well as for property alleged to have been sold to the Government.”
In view of all these authorities we conclude that the plaintiffs, under this special act, are entitled by virtue of its provisions to a judgment in their favor for the value of property lost through detention caused by imperious military necessity.
There remains to be considered one more point as to the special act. It refers to us the claim and “all papers relating *160 thereto * * * for adjudication according to law, on the proofs heretofore presented, and such other proofs as may.be adduced.” The proofs referred to this court, which are understood to be all that were before the Congress, consist of affidavits and letters, some of which could under no theory of the law of evidence as administered in common law courts be admitted here (Brannen v. United States, 20 C. Cls., p. 219). To those the defendants object, and this objection is clearly good, unless the act intended to change the law of evidence in this case.
Unless this be the intention of the act, we fail to see how any force can be given to the words “for adjudication according to law on the proofs heretofore presented,” and we have accord-, ingly considered these proofs, attaching such weight to the statements of fact therein contained as in our judgment seemed proper, and disregarding all expressions of opinion, but admitting the proofs as competent evidence.
Judgment for plaintiffs in the sum of $21,600.
Nott, J., did not sit in this case, and took no part in its decision.
Weldon, J., being ill, did not sit in this case, and took no part in its decision.
In the case of Charles A. Perry & Co. v. The United States judgment was at the same time entered for $44,025.