UNITED STATES v. CERTAIN TRACT OF LAND IN CUMBERLAND TOWNSHIP, ADAMS COUNTY, PA. (two cases).

(Circuit Court, E. D. Pennsylvania. April 22, 1895.)

Nos. 34 and 64.

EMINENT DOMAIN—RIGHT OF, IN UNITED STATES GOVERNMENT—PUBLIC USE— WHAT IS—NATIONAL CEMETERY AT GETTYSBURG.

The act of congress approved March 3. 1893, appropriating money for the purchase of land at Gettysburg, Pa., for the purpose of preserving the lines of battle there, and of marking the leading tactical positions of the battlefield with tablets, and for opening avenues, etc., does not indicate such a public use under the constitution as to justify condemnation proceedings under the subsequent act of June 5, 1894. Butler, District Judge, dissenting.

These cases arose from the filing of two separate petitions of Ellery P. Ingham, Esq., United States district attorney for the Eastern District of Pennsylvania, praying the court to appoint

two juries to estimate and determine the value of the estates and interests of all parties concerned in two certain tracts of land situate in Cumberland township, Adams county, Pa., more particularly described by metes and bounds in the said petitions, which tracts were said to be owned by the "Gettysburg Electric Railroad Company."

The petitions, after reciting the act of congress conferring jurisdiction upon the department of justice in land condemnation proceedings, and the act of assembly of Pennsylvania of June 8, 1874, providing a method of vesting the title to lands in that state in the United States when no agreement of purchase could be made with the owners thereof, recited that by an act of congress approved on the 3d day of March, A. D. 1893, entitled "An act making appropriations for sundry civil expenses of the government for the fiscal year ending June 30th, 1894, and for other purposes," it is provided, inter alia, as follows: "Monuments and tablets at Gettysburg. For the purpose of preserving the lines of battle at Gettysburg, Pennsylvania, and for properly marking with tablets the positions occupied by the various commands of the armies of the Potomac and of Northern Virginia on that field, and for opening and improving avenues along the positions occupied by troops upon those lines, and for fencing the same, and for determining the leading tactical positions of batteries, regiments, brigades, divisions, corps, and other organizations with reference to the study and correct understanding of the battle, and to mark the same with suitable tablets, each bearing a brief historical legend, compiled without praise and without censure, the sum of twenty-five thousand dollars, to be expended under the direction of the secretary of war." (4) That by a joint resolution of congress, approved June 5, 1894, entitled "Joint resolution, authorizing the purchase or condemnation of land in the vicinity of Gettysburg, Pennsylvania," it is provided as follows: "Whereas, congress appropriated by the act of March third, eighteen hundred and ninety-three, the sum of twenty-five thousand dollars to acquire certain lands for 'the purpose of preserving the lines of battle at Gettysburg, Pennsylvania, and for properly marking the positions occupied by the various commands of the armies of the Potomac and Northern Virginia, on that field, and for opening and improving avenues along the positions occupied by the troops, and for determining the leading tactical positions of both armies; and whereas, an appropriation for the further sum of fifty thousand dollars is now under consideration by congress for like purposes which has passed the house of representatives during the present session and is now pending in the senate; and whereas, it has been recently decided by the United States court, sitting in Pennsylvania, that authority has not yet been distinctly given for the acquisition of such lands as may be necessary to enable the war department to execute the purposes declared in the act aforesaid; and whereas, there is imminent danger that portions of said battlefield may be irreparably defaced by the construction of a railway over the same, thereby making impracticable the execution of the provisions of the act of March third, eighteen hundred and ninety-three: Therefore, be it resolved, by the senate and house of representatives of the United States of America in congress assembled, that the secretary of war is authorized to acquire by purchase (or by condemnation) pursuant to, the act of August first, eighteen hundred and eighty-eight, such lands or interest in lands, upon or in the vicinity of said battlefield as, in the judgment of the secretary of war, may be necessary for the complete execution of the act of March third, eighteen hundred and ninety-three: provided, that no obligation or liability upon the part of the government shall be incurred under this resolution nor any expenditure made except out of the appropriations already made and to be made during the present session of this congress." (5) That in order to carry out the purposes of the aforesaid act of March 3, 1893, it is necessary that the United States acquire title in fee simple to the said tracts of land. That the said tracts include many important tactical positions occupied by many different commands and bodies of troops while engaged in the battle of Gettysburg, at some of its most critical periods. That if title to the said tract be not vested in the

United States it will be impossible to carry out effectually upon this part of the battlefield the purposes expressed in the said act of congress, "of preserving the lines of battle," "properly marking with tablets the positions occupied," and "determining the leading tactical positions of batteries, regiments, brigades, divisions, corps and other organizations with reference to the study and correct understanding of the battle, and to mark the same with suitable tablets." That no agreement can be made with the owners of the said tracts for the purchase thereof.

The jury of view in the first case subsequently filed a report assessing damages for the taking of the property; and on March 26, 1895, the Gettysburg Electric Railroad Company filed exceptions thereto, alleging, in substance, that the purposes specified in the petition were not public uses or purposes, authorizing the condemnation by the United States of private property. In the second case a motion to quash the petition was filed upon substantially the same reasons. The two matters were argued at the same time.

Ellery P. Ingham, for plaintiff.

Thomas Hart, Jr., and Chas. Heebner, for defendant.

DALLAS, Circuit Judge. The right of the United States to take private property for public use, upon making just compensation, though questioned in Pollard's Lessee v. Hagan, 3 How. 212, is now fully recognized; but that this right cannot be exercised, within the limits of the several states, for any purpose which is not incident to some power delegated to the general government, and necessary, or at least adapted, to its execution, is equally well settled. 1 Hare, Const. Law, p. 346; Kohl v. U. S., 91 U. S. 367; U. S. v. Fox, 94 U. S. 315; Van Brocklin v. Tennessee, 117 U. S. 151, 6 Sup. Ct. 670; Cherokee Nation v. Southern Kan. Ry. Co., 135 U. S. 641, 656, 10 Sup. Ct. 965.

The end sought to be promoted in the present instance highly commends itself to patriotic sentiment and strongly appeals to the generous impulses of all who justly esteem the services of those by whom the great battle of Gettysburg was fought and won; but such feelings may not be indulged in a place where justice is judicially administered without respect to persons, and where the constitution of the United States must be regarded as imperatively prescribing the paramount rule of civil conduct as well for the government as for the people. Therefore, the only question is whether the object to the furtherance of which these petitions are directed is germane to the execution of any power vested in the general government; and upon this question I have reached a conclusion which to me seems irresistible. The powers of congress are distinctly enumerated in the constitution, and in that enumeration none is included to which the uses for which it is proposed to condemn this land can be related, without, in my opinion, enlarging the constitutional grant by grafting upon its express terms a construction so lax and comprehensive as to be subversive of its limited character. The learned district attorney has referred to but a single clause (article 1, § 8, cl. 1) as conferring the authority now claimed, and that clause is wholly irrelevant. The "power to lay and collect taxes * * * to pay the debts and provide for the common defense and general welfare of the United States" is quite distinct

from the right to take private property for public use; and it is not the power of taxation, but the right of eminent domain, which is here asserted. Government may, in time of war, appropriate or destroy private property. This is justified by "the necessities of war." U. S. v. Pacific R. R., 120 U. S. 234, 7 Sup. Ct. 490. But no deduction from this doctrine of the public law can be made and applied in time of peace, be the incentive what it may, without violation of "the supreme law of the land."

Entertaining these views, with which no judicial decision that has been brought to my notice conflicts, it is impossible for me to sustain these proceedings. In the first case the exceptions to which this opinion is applicable are sustained. In the second case the motion to quash is granted.

BUTLER, District Judge (dissenting). I regret that I cannot unite in the above conclusion. I do not propose to enter upon an argument to sustain my views, but to state very briefly the reasons on which they are founded.

While the government may take land for public use, the use must be such as arises out of the exercise of its legitimate functions. It is not necessary, however, that the land or the use be indispensable. It is sufficient if it be convenient and serviceable. Within this limitation congress and the executive cannot be controlled; they are the judges. The courts can only interfere where the limit is transcended. The constitution does not define the special uses for which land may be taken; they could not be so defined; the occasion for them changes with the change of circumstances. As for instance, the government has the care and wardship of the Indian tribes. It must provide for them, protect its citizens against them, and keep the public peace in this respect. Of recent times it has come to be believed that this duty can best be discharged by teaching them the arts and industries of civilized life. The government has adopted this view, and consequently established schools for the purpose. Schoolhouses have thus become necessary. In some instances government buildings have been appropriated to this use, and in others buildings have been rented. That land may be taken for the erection of such schoolhouses I cannot doubt.

That land may be taken for customhouses, courthouses, post offices, etc., is not now questioned, though it was formerly denied. Here the use is virtually indispensable. If however, it were a convenience merely, which facilitated the discharge of the government's duties, the right to take would be equally clear.

It is the duty of the government to raise and maintain armies, and to fight battles when necessary. As a consequence, it is necessary to establish military schools, barracks, hospitals, etc. That land may be taken for these purposes is plain. It is absolutely necessary to a discharge of the duty. The right to take, however, is just as clear in the absence of such necessity, when the use aids the government in this respect. If the construction of a railroad between the capital and the seaboard, or any other point where none exists, should become a military necessity or a useful con-

venience in the discharge of these duties, by facilitating the transportation of troops or munitions of war, the government might take land and construct it—without seeking for authority in any other constitutional provision. The power to raise and maintain armies imposes the duty of caring for its soldiers, promoting their welfare during life, and providing for decent burial (at least) after death—whether they die in battle or in time of peace. It may, therefore, do whatever is necessary to these ends. Consequently it may establish hospitals, take land for cemeteries, etc. It could not leave its dead to fester where they fall. To do so would not only outrage public decency, but would raise a serious obstacle to the discharge of its express duty—the maintenance of armies—by inclining men to avoid its service. It may erect monuments to commemorate special acts of heroism, and award pensions for meritorious services; because these and similar acts, directly and materially tend to aid it in discharging the duty stated.

The land described in the petition is adjacent to the Gettysburg National Cemetery. I cannot doubt that it might have been taken to enlarge and improve that property. How much is necessary to that purpose congress and the executive are the judges of. This however is not the purpose named in the statute.

The land is required to carry out the provisions of the act of 1893, to wit:

"For the purpose of preserving the lines of battle at Gettysburg, Pennsylvania, and for properly marking with tablets the positions occupied by the various commands of the armies of the Potomac and of Northern Virginia on that field, and for opening and improving avenues along the positions occupied by troops upon those lines, and for fencing the same, and for determining the leading tactical positions of batteries, regiments, brigades, divisions, corps. and other organizations with reference to the study and correct understanding of the battle, and to mark the same with suitable tablets, each bearing a brief historical legend."

In my judgment this is a legitimate public use of the land. The battle was a great lesson in military science, the greatest ever taught on this continent, at least—a most important illustration in strategy, and the art of war. That it may be fully understood and appreciated hereafter, it is necessary to do just what is proposed—preserve the battle field in its original condition, mark the positions and movements of the troops, and the different arms of the service, at the various stages of the battle; so that it may be seen, as upon a great chart, precisely how the battle was fought. The government proposes to perpetuate and secure this lesson for the sake of what it may teach to those who at present constitute its armies, as well as to those who will hereafter constitute them. In my judgment this is a legitimate purpose; and it can only be accomplished by taking the land. The power to take it is, I believe, embraced in the power to maintain armies and teach them military science.

I understand the very able counsel who opposes the proceeding to say that the government should own the land, but should obtain it by purchase. If the government should own the land, it is because the government has a legitimate use for it; otherwise it has

no power to purchase, or even to accept it as a gift, and expend money for its improvement. By what authority can the government take and hold land in trust for such purposes, unless they serve a legitimate public use, and especially expend money upon them? A concession that it may purchase, or accept the land as a donation, for the uses stated, seems to me to be a plain concession of the right to take. The government has repeatedly accepted and improved lands for such uses; and the propriety of it has not even been questioned. It so accepted and improved the lands embraced in the Gettysburg National Cemetery and in the Chickamauga and Chattanooga National Park, expending large sums of money on each.

Furthermore this battle field is of transcendent national interest. The ground is hallowed and made sacred by the blood shed upon it, at the most important epoch in the nation's history—in the supreme hour of its life. All right-minded men would say, I think, that it is fitting the nation should own and preserve it from desecration. It may be replied that this is mere sentiment. I think, however, it is something more. But if it is not, it is a most healthy sentiment, the encouragement of which directly tends to preserve the nation, and thus to aid the government in discharging its highest duty. It may be said the same reasons require the ownership of all other important battle fields of the nation; I think not. If they do, however, the government should own them, for the sake of what they teach, and the love of country which they inspire. I believe the other objections urged against the proceeding, as well as the exceptions to the report of the jury, should also be dismissed.