JOSE ANTONIO ARCE ET AL. v. THE STATE.

No. 4314. Decided April 17, 1918.

1.—Murder—Practice on Appeal.

Where the judgment was reversed and the cause remanded, questions of change of venue, continuance, jury, etc., need not be considered on appeal.

**2.—Same—State of War—Mexico—United States.**

Where the homicide occurred during the military troubles between the United States and Mexico, and that at the time of said homicide there existed between the two nations an incomplete state of war, although none had been declared on either side, and a military force was organized under the de facto government of Mexico with the view of invading the State of Texas, and which attacked the United States troops located on the American side of the Rio Grande, in which some of the American soldiers were killed and wounded, and some of the Mexican soldiers were arrested and tried for murder in the State District Court of Webb County, held, that if the defendants are guilty of an offense, they should be dealt with by the United States government, and not by the courts of Texas, as the question of inchoate or incomplete war is one for the Federal and not for the State authorities to deal with.

**3.—Same—State of War—Reversible Error—State Courts.**

Where the defendants, who were tried for murder in the State court, were Mexican soldiers at the time of the homicide, controlled and commanded by their superior officers to attack a detachment of United States troops in a quasi state of war, they should not be convicted of murder in the State court if the same had jurisdiction. However, the matter is for the Federal authorities and not the State court, and the judgment of conviction must be reversed and the cause remanded.

Appeal from the District Court of Webb. Tried below before the Hon. J. F. Mullally.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*C. M. Henry, Greer & Hamilton,* and *George & Townes,* for appellants. —On question of state of war: Cases cited in opinion. Ex parte Coupland, 26 Texas, 387; Bishop v. Jones, 28 id., 294; State v. White, 25 Texas Supp., 465; Dole v. Merchants Mut. Ins. Co., 51 Me., 465; Buena Ventura, 87 Fed., 927; De Nayne, 4 C. Rob., 251; Prize Cases, 2 Black. (U. S.), 635; Lewis v. Ludwick, 98 Am. Dec., 454.

On question of homicide committed by military subordinates: U. S. v. Clark, 31 Fed. Rep., 710; McCall v. McDowell, 1 Abb. (U. S.), 212; Wadsworth v. Shortall, 65 L. R. A., 193; Riggs v. State, 91 Am. Dec., 272; People v. McLeod, 25 Wend. (N. Y.), 481.

*E. B. Hendricks,* Assistant Attorney General. for the State.

DAVIDSON, PRESIDING JUDGE.—Jose Antonio Arce, Vicinte Lira, Pablino Sanchez, Jesus Cerda, Isabel de los Santos, and Fredrico Guiter-rez Zapata were charged with killing William Oberlies. Four of these defendants were placed upon trial for the homicide, namely, Arce, Lira, Sanchez, and Cerda, and given the death penalty for the killing of Oberlies, who, it seems, was a corporal in the United States Federal army.

There are many interesting questions presented for revision in various ways. The motion to change the venue, application for continuance, exception to the jury and incidental matters will not be discussed. They may not arise upon another trial if one should occur, and should they,

will be presented in a different light and from a different view perhaps than as set forth in the record.

A condensed statement of the facts will show that during the recent events on the Rio Grande and in Mexico there was trouble between the United States and Mexico. We know, as a matter of history, of the current events attending this trouble, that the United States invaded Mexico with a column of troops under General Pershing and there may have been other like occurrences on the Rio Grande by the United States troops. It is not the purpose of this opinion to go into the history of the trouble between the two countries and the incidental fights and battles that may have occurred in connection with those troubles. Suffice it to say they did occur, and under the authorities this brought about a condition of war between the two countries. It was not what the authorities may term a complete state of war, but rather in the nature of an incomplete state of war. There was no formal declaration of war as we understand the history of the times between the two countries, where a state of warfare was recognized as existing between the two countries. During these troubles, among other things that occurred, was a force organized at Monterey by the direction and under the authority of the Carranza de facto government. It is shown by this record that when this command was completed and the plan laid, it was done with the view of invading Texas and attacking some of the Federal troops located just below Laredo at San Ygnacio. There was a company of cavalry of the regular army stationed at this point with trenches and other means incident to resistance from attack. These Mexican troops made an attack upon this troop of United States cavalry at night. On the night of the attack another troop of United States cavalry reached the point where the first troop was camped, to spend the night en route to Zapata County, and when the fight came off that night both troops were in action. Four or five United States soldiers were killed and nine or ten of the Mexicans. Three of the Mexicans and one that was wounded were captured. These were tried under this indictment in the Texas State courts and on conviction given the death penalty. The evidence makes it clear that these Mexican troops were commanded by Carranza officers. One of these officers was killed during the fight, who seemed to rank as a lieutenant colonel. The commanding officer of the Mexicans was De los Santos, who, it seems, was later captured by the forces of Villa and executed. His name was in this indictment but he was never arrested. That a state of warfare existed between the two countries is not questioned. Brigadier General Enoch H. Crowder, Judge Advocate, U. S. A., has the following to say in an official opinion: "It is thus apparent that under the law there need be no formal declaration of war, but that under the definition of Vattel a state of war exists, so far as concerns the operations of the United States troops in Mexico, by reason of the fact that the United States is prosecuting its rights by force of arms and in a manner in which warfare is usually conducted. The statutes which are operative only during a period of war have been interpreted as relating to

a condition and not a theory. . . . I am, therefore, of the opinion that the actual conditions under which the field operations in Mexico are being conducted are those of actual war. That within the field of operations of the expeditionary force in Mexico it is a time of war within the meaning of the fifty-eighth article of war." There is also, in connection with this record, in the motion for new trial, exhibited to the court excerpts from a communication from the district attorney of Webb County to John L. Wroe, secretary to Governor Ferguson, as follows: "The jury returned the verdict of guilty and assessed the punishment of death. These four Mexican citizens testified under oath that they belonged to the Constitutionalist army of Mexico; that the band that attacked San Ygnacio consisted of seventy-five men, and that they were publicly organized and equipped in Monterey and Jarita, with the full knowledge of the officers of the de facto government of Mexico. The recent trials in Webb County of the bandits who murdered our soldiers at San Ygnacio, the fact that they were publicly organized and equipped in Mexico; that they met and mingled with the forces and officers of the de facto government; that they were furnished transportation in three railroad cars from Monterey to Jarita; that it was widely proclaimed at Monterey that these bands were going to make hostile incursions into Texas; that men high in the councils of the de facto government were cognizant of the unlawful enterprise and yet not a finger was raised by that government to frustrate the mission. I charge the de facto government with full responsibility for the recent raids committed in my district, and I charge that these raids were conducted with the knowledge and consent, if not the approbation of the de facto government."

It might also be stated in this connection that it is a question for judicial cognizance and knowledge that this battle at San Ygnacio was never disavowed by the de facto government of Mexico. It seems also to be within accurate statement that the organization of these expeditionary forces attacking San Ygnacio was by and under the direction of General Nafarrette, General Fierros, General De la Rosa, with Colonel Cavanas, Colonel Isabel de los Santos. Colonel Cruz Ruis and others, and these were officers of the constitutionalist or de facto Carranza government. Colonel Cruz Ruiz was killed in the battle.

This, we think, was a state of warfare. See, in addition to what has been quoted from Brigadier General Crowder, Bas. V. Tingy (4 Dal., 35), I Law. Ed., 732-733, U. S. Supreme Court Reports, as follows: "It may, I believe, be safely laid down, that every contention by force between two nations, in external matters, under the authority of their respective governments, is not only war, but public war." While the invasion of Mexico by General Pershing's column was not a public or complete war, or not preceded by a declaration of war against Mexico by the United States, it was an act of war and under the definitions given by General Crowder and the authorities generally it was technically and within the limited meaning of the word, war. It was not made with the consent of the de facto government of Mexico, but rather in fact over

the protest of that country. In the case of Montoya v. United States (180 U. S., 261), 45 Law. Ed., 521, it was said: "To sustain a claim under this section, it is incumbent upon the claimant to prove that the Indians taking or destroying the property, belonged to a band, tribe or nation in amity with the United States. The object of the Act is evidently to compensate settlers for depredations committed by individual marauders belonging to a body which is then at peace with the government. If the depredation be committed by an organized company of men constituting a band in itself, acting independently of any other band or tribe, and carrying on hostilities against the United States, such acts may amount to a war for the consequence of which the government is not responsible under this act, or upon general principles of law. United States v. Pacific R. Co., 120 U. S., 227, 30 L. Ed., 634, 637, 7 Sup. Ct. Rep., 490."

This extract is made from Preciat v. United States (67 U. S., 638), 17 Law. Ed., 476: "War has been well defined to be 'that state in which a nation prosecutes its right by force. The parties belligerent in a public war are independent nations. But it is not necessary, to constitute war, that both parties should be acknowledged as independent nations or sovereign states. A war may exist where one of the belligerents claims sovereign rights as against the other." The Montoya case was a claim by a citizen against the United States for a depredation by an Indian band commanded by the Chief Victoria. Some of the tribe of which Victoria was chief was friendly to the United States, many of them were not. Victoria organized a band of his own tribe and Indian warriors from other tribes and depredated upon the people of New Mexico, and finally went into old Mexico. There was a fight between the band of Victoria and United States troops. The claim was made for a depredation made by Victoria and was held not valid because it was not brought within the terms of the law which makes the United States responsible only for depredations by tribes friendly to the United States.

It occurs to the writer that according to the principle laid down in these decisions and under the general rules with reference to warfare, that the Mexican column that attacked the troops at San Ygnacio came within those rules, and that if they were to be dealt with for crossing the river and fighting our troops it should be done by the United States government and not by the Texas courts. Texas has no authority to declare war against Mexico nor create a state of war. This must be done by our general government at Washington by the special delegated authority in the Constitution of the United States. Whatever may have been the rights of these Mexicans, the authority to punish, the writer feels, is within the jurisdiction of the United States and not the courts of Texas. If there was a state of war between the two countries, actual and complete, or inchoate and incomplete, then it became an international or Federal question and not a State matter.

It might be interesting but of no practical value to follow this matter

with reference to some fighting that occurred in Mexico at the time General Pershing's column invaded that country in which some of our soldiers were killed and some captured.    The principles above laid down, as far as our information goes, controlled the relation between the de facto government of Mexico and the United States with reference to that battle and our soldiers who were captured.    They were not tried by the Mexican courts but turned over to the United States, as we gather the history of that transaction.    So from this viewpoint we are of the opinion that this judgment should be reversed.    We might also refer to the invasion of Mexico by the United States army and navy at Vera Cruz under the command of General Funston.    Our soldiers if captured would have been subject to trial and punishment in Mexican courts under the same rules as their soldiers would in our courts.

There is another interesting question or two in the case which may be mentioned incidental to the other question.    General Mann was used as a witness, as were other Federal officers, among them the two captains who commanded the two troops of cavalry on the night of the fight. From their testimony a general statement may be made to the effect that these Mexican soldiers would be controlled by their officers in command and be obedient to them; that the command was organized under the authority of the Carranza or de facto government of Mexico and were, in fact, a military command.    By this testimony it seems that wherever under such circumstances the soldiers must obey the order of their superiors and failure to do so would subject them to discipline which rates from minor punishment to death, according to the rule which has been violated by those under authority.    When a soldier is ordered to fight it is his duty to do so, and he may forfeit his life on refusal so to do.    If he deserts under certain circumstances he may be shot or executed.    These Mexican soldiers were ordered by their officers, commanded by the officers, headed by the officers, to make the fight; the officers led them into the battle and they fought.    Some were killed, others escaped and fled.    Some were wounded, one of whom was captured and is under sentence in this case.    It seems while being tried he was suffering severely from a wound.    One at least of the defendants claimed to have been forced to go into battle by his commanding officer. He did not desire to fight but under the rules of warfare if he deserted he would be tried and would be shot or if he disobeyed orders and failed to engage in the fight he might forfeit his life.    If the State courts had jurisdiction of these defendants we are of opinion the conviction is erroneous.

From any viewpoint of this case we are of opinion that this judgment should be reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE, absent.