**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARLOS PENA,

*Plaintiff - Appellant*,

v.

CITY OF LOS ANGELES,

*Defendant - Appellee*.

No. 24-2422

D.C. No.
2:23-cv-05821-
JFW-MAA

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted January 16, 2025
Pasadena, California

Filed November 4, 2025

Before: Richard C. Tallman, Michelle T. Friedland, and
Mark J. Bennett, Circuit Judges.

Opinion by Judge Bennett;
Concurrence by Judge Friedland

# SUMMARY[*]

## Fifth Amendment's Takings Clause

The panel affirmed the district court's judgment for the City of Los Angeles in a 42 U.S.C. § 1983 action brought by Carlos Pena seeking compensation under the Fifth Amendment's Takings Clause for property destruction that occurred after Los Angeles Police Department (LAPD) officers pursued an armed fugitive inside his shop.

After a thirteen-hour standoff, in an attempt to subdue the fugitive, LAPD SWAT officers fired dozens of tear gas canisters through the walls, door, roof and windows of Pena's store. The tear gas damaged the shop, as well as the inventory and equipment inside. The parties do not dispute that the officers' conduct was authorized, reasonable, and lawful.

The panel held that the meaning of the Takings Clause at the Founding and two centuries of precedent demonstrate that the government's destruction of private property when necessary for the defense of public safety is exempt from the scope of the Takings Clause. Because law enforcement took reasonable and necessary actions to ensure public safety in this case, their actions were beyond the scope of the Takings Clause. Accordingly, Pena failed to state a claim under the Takings Clause.

Concurring in the judgment, Judge Friedland wrote that although she agreed with the majority that Pena did not state

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

a Takings Clause claim, she would reach that conclusion for a different reason. She would hold that the Los Angeles police's actions fell under the search-and-arrest privilege that serves as a background limitation on all property rights, including Pena's here, so no property right was infringed at all and, accordingly, no compensation was owed.

## COUNSEL

Jeffrey H. Redfern (argued) and Suranjan M. Sen, Institute for Justice, Arlington, Virginia; Luke Hasskamp and Jarod M. Bona, Bona Law PC, La Jolla, California; for Plaintiff-Appellant.

Michael M. Walsh (argued), Deputy City Attorney; Shaun D. Jacobs, Supervisory Assistant City Attorney; Kathleen A. Kenealy, Chief Assistant City Attorney; Denise C. Mills, Chief Deputy City Attorney; Hydee F. Soto, City Attorney; Los Angeles Office of the City Attorney, Los Angeles, California; for Defendant-Appellee.

## OPINION

BENNETT, Circuit Judge:

When an armed fugitive barricaded himself inside Plaintiff-Appellant Carlos Pena's print shop, officers of the Los Angeles Police Department (LAPD) pursued the armed fugitive inside Pena's store and damaged Pena's property. As Pena acknowledges, the officers acted reasonably and lawfully in all their actions. Pena nevertheless alleges that the damage caused by the officers constituted a compensable taking under the Takings Clause of the Fifth Amendment to the United States Constitution and that he is entitled to just compensation from Defendant-Appellee the City of Los Angeles for the destruction of his property. We hold that Pena fails to state a Takings Clause claim. The meaning of the Takings Clause at the Founding and two centuries of precedent demonstrate that the government's destruction of private property when necessary for the defense of public safety is exempt from the scope of the Takings Clause. Because history and precedent show that Pena's claim falls outside the scope of the Takings Clause, we affirm the district court's judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### a.  Factual Background

Carlos Pena owns and operates a print shop in Los Angeles. On August 3, 2022, an armed fugitive fleeing from law enforcement officers entered Pena's store, threw Pena out the front door, and barricaded himself inside.[1]  The shop

---

[1] The fugitive was armed with at least one firearm, "a pistol with an extended magazine," which he left at Pena's shop. On August 15, 2022,

was then surrounded by LAPD officers and deputy United States Marshals. After a thirteen-hour standoff, in an attempt to subdue the fugitive, LAPD SWAT officers fired dozens of tear gas canisters through the walls, door, roof and windows of Pena's store.[2] The tear gas damaged the shop, as well as the inventory and equipment inside. Pena alleges that the damages exceed $60,000.[3] The parties do not dispute that the officers' conduct was authorized, reasonable, and lawful.[4]

## b.  **Procedural Background**

Pena first sought compensation from the United States Marshals Service. The Service denied Pena's claim and advised him to seek compensation from LAPD. Pena filed two claims with the City of Los Angeles, but the City did not respond. Pena's attorney sent a letter to the Los Angeles City Attorney seeking compensation but again received no

---

following a second barricade incident, the fugitive "was discovered deceased with a self-inflicted gun shot [sic] wound."

[2] When police officers eventually entered the shop, they discovered that the fugitive had escaped.

[3] In the original claim for damages Pena submitted to the City, Pena alleged that the fugitive—not the police—caused much of the damage. But in his federal court complaint, Pena alleges that the damages were caused exclusively by the LAPD. Because the City does not challenge this version of the facts, and the district court's order relied on Pena's statement of facts in his complaint, we assume that the destruction of Pena's property was caused entirely by the City.

[4] For example, Pena's complaint states: "[Pena] does not question the City's officers' determination that the public good required the destruction of his shop, but he does not believe that he should be left to bear the resulting costs." And Pena's declaration in support of his motion for partial summary judgment states that he does "not fault the City's police officers for acting in the public's interest."

response.  Pena then filed a complaint in federal court seeking compensatory damages against the City under 42 U.S.C. § 1983, alleging a claim for the taking of private property without just compensation in violation of the Fifth Amendment.  *See* U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation.").

The City filed a motion for judgment on the pleadings, arguing that Pena's claim failed because the Takings Clause carries an implicit exception for property destroyed pursuant to a valid exercise of the police power, and "the Takings Clause does not require compensation for damaged or destroyed property when it was objectively necessary for officers to damage or destroy that property in an active emergency to prevent imminent harm to persons."  The district court denied that motion because the issues raised would be more appropriately resolved on a motion for summary judgment.  Following discovery, Pena moved for partial summary judgment, arguing that when the government intentionally destroys private property for public purposes, it is a taking.  The district court denied Pena's motion on the grounds that the destruction of Pena's store in pursuit of the fugitive "constituted a valid use of police power and did not constitute a taking for purposes of the Fifth Amendment."  Based on the district court's determinations, the parties stipulated to judgment for the City, and Pena now appeals.

## II. JURISDICTION

We have jurisdiction under 28 U.S.C. § 1291.

## III.  STANDARD OF REVIEW

Whether this type of police action constitutes a compensable taking is a question of law that we review de novo.  *See Yeager v. Bowlin*, 693 F.3d 1076, 1079 (9th Cir. 2012).

## IV.  DISCUSSION

The parties agree that the law enforcement officers' destruction of Pena's property in pursuit of an armed fugitive was a reasonable and lawful exercise of the City's police powers.  But Pena contends that even though the actions were reasonable and lawful, the City's destruction of his property nonetheless comes with a price—just compensation under the Takings Clause.  In response, the City argues that the Takings Clause does not provide any recovery for property damage caused by police officers' lawful and reasonable efforts to enforce criminal laws and pursue criminal suspects.

In determining whether Pena's claim has merit, we look first to history to determine the scope of the constitutional right granted by the Takings Clause.[5]  At the time of the

---

[5] The concurrence suggests that we should instead begin with an analysis of the scope of the property right itself and identifies statements in federal cases suggesting that no property right was invaded here because "a traditional common law privilege . . . limits property rights" to exclude an official searching for or arresting a criminal.  Concurrence at 32–33.  But under our precedent, "whether a property right *exists* . . . is a question of state law . . . . [W]e look to state law to determine what property rights exist and therefore are subject to 'taking' under the Fifth Amendment." *Vandevere v. Lloyd*, 644 F.3d 957, 963 (9th Cir. 2011); *see also S. Cal. Edison Co. v. Orange Cnty. Transp. Auth.*, 96 F.4th 1099, 1104 (9th Cir. 2024).  Thus, whether Pena's property rights were invaded is a question of California law.  But faced with substantially the same claim as Pena's, the Supreme Court of California did not find that no property right was

Founding, the principle of just compensation did not require payment in cases where, like here, the government reasonably and necessarily destroyed property in pursuit of a dangerous fugitive. History counsels that such reasonable and necessary destruction by law enforcement officers falls outside the scope of the Takings Clause.

Jurisprudence since the Founding also provides Pena with no recourse. The Supreme Court has repeatedly affirmed the principle that the government's destruction of private property in the necessary defense of public safety does not give rise to a compensable taking. In sum, history and precedent establish that Pena does not plead a compensable taking under the Fifth Amendment, so we affirm the district court's grant of summary judgment dismissing Pena's claim.[6] Finally, we note that States and

invaded; rather, it found that the case fell outside the scope of California's analogue of the Takings Clause. *Customer Co. v. City of Sacramento*, 895 P.2d 900, 907 (Cal. 1995) ("There is nothing that indicates the provision was intended to . . . require the payment of just compensation for damage caused by the government's efforts to enforce the criminal laws."). While the court did state that such injuries as Pena's are "*damnum absque injuria* (i.e., a loss not giving rise to a cause of action)," *id.* at 908, that term does not indicate the lack of a property right, but rather the lack of a tort claim for damage to property. *See* EDWARD P. WEEKS, THE DOCTRINE OF DAMNUM ABSQUE INJURIA § 4 (1879); *see also Gray v. Reclamation Dist. No. 1500*, 163 P. 1024, 1032 (Cal. 1917) (holding that amendments to California's analogue of the Takings Clause "did not, touching the exercise of the police power, give a right of action for damages which theretofore were damnum absque injuria" even though "that a taking or damage is worked is universally conceded, and the sole ground upon which the denial of compensation is placed is that [the taking] is but a legitimate enforcement of the police power.").

[6] The district court denied Pena's motion for partial summary judgment because it found that "the damage to Plaintiff's shop was caused by the

municipalities may still provide relief for individuals in Pena's position under state and local law.

### a. **The Circuit Split**

The parties dispute whether the government's destruction of private property pursuant to the police power (rather than its seizure via eminent domain or otherwise) may ever constitute a compensable taking under the Fifth Amendment. This raises an issue of first impression for us. Many of our sister circuits, however, have already addressed the issue, and this "important question . . . had divided the courts of appeals." *See Baker v. City of McKinney*, 145 S. Ct. 11, 11 (2024) (Sotomayor, J., joined by Gorsuch, J., respecting denial of certiorari) (noting the circuit split respecting "whether the Takings Clause requires compensation when the government damages private property pursuant to its police power"). Specifically, our sister circuits have split on whether there is a categorical police power exception to the Takings Clause for the government's destruction of private property.

The States' police powers authorize law enforcement officers to prevent and combat crime, including violent crime.[7] *United States v. Morrison*, 529 U.S. 598, 618 (2000)

---

LAPD SWAT team's use of the police power that Plaintiff concedes was reasonable." While we affirm the district court's conclusion, our reasoning does not go as far as the district court's. As explained below, we do not hold that there is, or is not, a broad police power exception to the Takings Clause. Rather, we hold that because law enforcement took reasonable and necessary actions to ensure public safety in this case, their actions were beyond the scope of the Takings Clause.

[7] Although the City is a municipality, a municipality's exercise of the police power is analogous to that of the State. *See Cal. Reduction Co. v. Sanitary Reduction Works*, 126 F. 29, 34 (9th Cir. 1903) (identifying "the

("Indeed, we can think of no better example of the police power . . . than the suppression of violent crime and vindication of its victims."). The government may damage or destroy private property under its inherent police powers. *See Miller v. Schoene*, 276 U.S. 272, 279–80 (1928) ("[W]here the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property."). But the parties dispute whether the government's destruction of private property pursuant to the police power—rather than its seizure via eminent domain or otherwise, such as via so-called "regulatory" takings—may ever constitute a compensable taking under the Fifth Amendment.

Our sister circuits are split on the issue. Four courts—the Fourth, Fifth, Sixth, and Federal Circuits—have held that there exists no categorical police-power exception to the Takings Clause. The Fifth and Sixth Circuits confronted cases that presented very similar facts to Pena's. In those cases, the Fifth and Sixth Circuits each held that there exists no categorical police-power exception to the Takings Clause but, based on other exceptions to the Takings Clause, also held that no compensation was owed to the plaintiffs. In *Baker v. City of McKinney*, the Fifth Circuit held that "history, tradition, [and] historical precedent" counseled against the existence of a categorical police power exception. 84 F.4th 378, 383–84 (5th Cir. 2023), *cert. denied*, 145 S. Ct. 11 (2024) ("Indeed, the mere fact that

power of the Legislature or municipality under what is commonly designated as the 'police power of the state'"), *aff'd*, 199 U.S. 306 (1905).

Baker's property has been damaged or destroyed pursuant to the City's police power cannot decide this case."). But the Fifth Circuit nevertheless rejected Baker's takings claim, reasoning that "as a matter of history and precedent, the Takings Clause does not require compensation for damaged or destroyed property when it was objectively necessary for officers to damage or destroy that property in an active emergency to prevent imminent harm to persons."[8] *Id*. at 379. The Fifth Circuit referred to this as the "necessity exception to the Takings Clause." *Id.* at 388. As explained further below, we agree with the Fifth Circuit's rationale and find that law enforcement's reasonable and necessary destruction of property to protect public safety falls outside the scope of the Takings Clause.

In *Slaybaugh v. Rutherford County*, 114 F.4th 593 (6th Cir. 2024), *cert. denied*, 145 S. Ct. 1959 (2025), the Sixth Circuit also held that there exists no categorical police power exception to the Takings Clause.[9] *Id*. at 597. The Sixth Circuit found that it was "questionable" whether a police power exception to the Takings Clause "comport[ed] with the text and history of the Takings Clause or with precedent interpreting it." *Id.* (citing *Baker*, 84 F.4th at 384). It also recognized that a categorical police exception to the Takings Clause "would run afoul of Supreme Court precedent recognizing that the government's exercise of its police

---

[8] Baker's home suffered severe damage when "police officers employed armored vehicles, explosives, and toxic-gas grenades" while trying to apprehend an "armed fugitive [holding] a 15-year-old girl hostage inside" the house. *Baker*, 84 F.4th at 379.

[9] In *Slaybaugh*, police pursuing a murder suspect barricaded inside his parents' home "fired approximately 35 tear gas cannisters into the dwelling" attempting to "smoke him out" before entering the home and arresting the suspect. 114 F.4th at 595.

powers can, in some circumstances, amount to a taking." *Id.* Instead of adopting the Fifth Circuit's "necessity" exception, however, the *Slaybaugh* court held that the plaintiffs were not entitled to compensation because the police actions were justified by a "search-and-arrest privilege" "rooted in the common law [and] long recognized in our court system as a defense to trespass claims." *Id.* at 603–04. It held that "under the search-and-arrest privilege, law enforcement may forcibly enter a home to arrest someone, so long as (1) the arrest is lawful and (2) the use of force in carrying out the arrest is reasonable." *Id.* at 599.

The Fourth and Federal Circuits addressed this question in cases that were factually distinct from Pena's. The Fourth Circuit held it to be "axiomatic in the Supreme Court's jurisprudence" "[t]hat Government actions taken pursuant to the police power are not per se exempt from the Takings Clause."[10] *Yawn v. Dorchester County*, 1 F.4th 191, 195 (4th Cir. 2021). The Federal Circuit also rejected the idea of an absolute categorical police power exception to the Takings Clause, holding that "it is insufficient to avoid the burdens imposed by the Takings Clause simply to invoke the 'police powers' of the state, regardless of the respective benefits to the public and burdens on the property owner." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332

---

[10] The *Yawn* plaintiffs sought compensation for the killing of their bees following the county's use of an aerial pesticide spray to target mosquitos as part of efforts to combat the spread of the Zika virus. 1 F.4th at 192–93. The Fourth Circuit rejected the plaintiffs' claim because "the death of [their] bees was neither intentional nor foreseeable," and if the government "invasion [of property] is not intended or foreseeable, then it does not constitute a taking." *Id.* at 195.

(Fed. Cir. 2006). [11]    But the Federal Circuit cited with approval the notion that "items properly seized by the government under its police power are not seized for 'public use' within the meaning of the Fifth Amendment," and thus such seizures are not compensable takings. *Id*. (quoting *Seay v. United States*, 61 Fed. Cl. 32, 35 (2004)). [12]

On the other side of this split, the Seventh Circuit has held that "the Takings Clause does not apply when property is retained or damaged as the result of the government's exercise of its authority pursuant to some power other than the power of eminent domain." *Johnson v. Manitowoc*

---

[11] In *Acadia*, the plaintiffs, importers of computer parts, argued that the government violated their Fifth Amendment rights when it seized their goods upon importation and did not return them for over four years. 458 F.3d at 1328. The Federal Circuit rejected the plaintiffs' claims because "the prohibition on importing goods bearing counterfeit marks that misrepresent their quality and safety is the kind of exercise of the police power that has repeatedly been treated as legitimate even in the absence of compensation to the owners of the imported property." *Id.* at 1332–33.

[12] We also note that in a case before the Court of Federal Claims, the federal government took the position—in what appears to be its most recent formal stance on the issue—that "a valid exercise of the . . . police power . . . do[es] not constitute a compensable Fifth Amendment taking." United States' Mot. to Dismiss for Failure to State a Claim at 2, *Bachmann v. United States*, 134 Fed. Cl. 694 (2017) (No. 17-cv-00528), ECF No. 5. In that case, the Court of Federal Claims held:

> When private property is damaged incident to the exercise of the police power, such damage is not a taking for the public use, because the property has not been altered or turned over for public benefit. Instead, both the owner of the property and the public can be said to be benefited by the enforcement of criminal laws and cessation of the criminal activity.

*Bachmann*, 134 Fed. Cl. at 696.

*County*, 635 F.3d 331, 336 (7th Cir. 2011).**[13]**  In so doing, the Seventh Circuit adopted a broad police-power exception to the Takings Clause.  *Id.*  Applying that broad exception in *Johnson*, the Seventh Circuit held that because the actions resulting in property destruction "were taken under the state's police power . . . [t]he Takings Clause claim [was] a non-starter."  *Id.*  In unpublished decisions, the Third and Tenth Circuits have also adopted a broad police-power exception to the Takings Clause.  *See Zitter v. Petruccelli*, 744 F. App'x 90, 96 (3d Cir. 2018) (finding no taking under the Takings Clause where law enforcement officers acquired plaintiff's property pursuant to a lawful search warrant, and quoting *Johnson*, 635 F.3d at 333–36, for the principle that the seizure of property pursuant to lawful search warrants under the police power cannot be a taking); *Lech v. Jackson*, 791 F. App'x 711, 717 (10th Cir. 2019) ("[W]hen the state acts pursuant to its police power, rather than the power of eminent domain, its actions do not constitute a taking for purposes of the Takings Clause.").

But because "it is not necessary to decide" whether there exists a categorical police-power exception to the Takings Clause, "it is necessary *not* to decide" whether such a broad exception exists.  *Cf. Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 348 (2022) (Roberts, C.J., concurring in the judgment).  Accordingly, we hold only that no taking occurs for the purposes of the Takings Clause when law enforcement officers destroy private property while acting reasonably in the necessary defense of public safety.

---

[13] In *Johnson*, the plaintiff alleged that law enforcement violated his Fifth Amendment rights by extensively damaging his property while executing search warrants related to the allegedly criminal activities of the plaintiff's tenant.  635 F.3d at 332–33.

That, Pena admits, is what occurred here. Law enforcement officers destroyed Pena's property while acting reasonably to capture an armed fugitive fleeing from police. The "necessity exception to the Takings Clause," *Baker*, 84 F.4th at 388, therefore applies to Pena's claim, and no compensable taking occurred.

**b. The Takings Clause at the Founding**

Our decision to recognize a necessity exception to the Takings Clause is supported by both the scope of the Takings Clause at the Founding and Takings Clause jurisprudence. The Fifth Amendment's Takings Clause provides that "private property" shall not "be taken for public use, without just compensation."[14] U.S. CONST. amend. V. In Pena's telling, the lawful, necessary, and reasonable destruction of private property by law enforcement in pursuit of an armed fugitive falls within the scope of the Takings Clause.[15] But at the Founding, the principle of just compensation was inconsistently applied by various state and colonial legislatures and courts. And in the limited Founding-era instances where courts were presented with takings claims following the government's seizure of private property as part of necessary efforts to protect public safety, those claims were rejected as outside the scope of the Takings Clause.

---

[14] The Takings Clause is sometimes referred to as the Just Compensation Clause. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 306 n.1 (2002).

[15] Pena has consistently argued that the Takings Clause requires compensation no matter the reason government destroys private property. At oral argument, for example, Pena's counsel confirmed that his construct would cover law enforcement's destruction of property in pursuit of fugitives holding hostages or during an attempt to rescue individuals buried alive by criminals. Oral Arg. at 4:08–5:28.

The Supreme Court has urged lower courts to examine the historical record when attempting to determine the scope of constitutional rights.  *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 18 (2022) (holding that in construing the scope of the Second Amendment, "[t]he Courts of Appeals" are to "ascertain the original scope of the right based on its historical meaning"); *see also Tyler v. Hennepin County*, 598 U.S. 631, 637–44 (2023) (determining the applicability of the Takings Clause from "[h]istory and precedent" reaching back to Magna Carta).  So, we look first to history to determine whether, at the Founding, the destruction of private property pursuant to reasonable law enforcement actions necessary to ensure public safety fell within the meaning of the Takings Clause.

The Supreme Court has traced the roots of the Takings Clause (and the constitutional principle of just compensation) to Magna Carta.  *See Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015).  The Supreme Court has specifically invoked Clause 28 of Magna Carta as laying the foundation for the Takings Clause: that clause forbade the English government's seizure of "corn or other provisions . . . without immediately tendering money therefor, unless he can have postponement thereof by permission of the seller."  *Id*. (quoting MAGNA CARTA, cl. 28, *reprinted in* WILLIAM SHARP MCKECHNIE, MAGNA CARTA: A COMMENTARY ON THE GREAT CHARTER OF KING JOHN 329 (2d ed. 1914) ("Magna Carta")).

Magna Carta's treatment of personal property differs from its treatment of "real property"—land and attached structures—whose uncompensated seizure was authorized so long as the state abided by procedural regularities.  "As originally drafted, the Great Charter provided that '[n]o freeman shall be . . . disseised of his freehold . . . but by

lawful judgment of his peers, or by the law of the land.'" Kerry v. Din, 576 U.S. 86, 91 (2015) (alteration in original) (emphasis removed) (quoting MAGNA CARTA, ch. 29, *reprinted in* 1 EDWARD COKE, THE SECOND PART OF THE INSTITUTES OF THE LAWS OF ENGLAND 45 (1797)). But although Magna Carta itself distinguishes between personal and "real" property, in practice, the English Parliament's "*acquisition* of [real] property for fortifications, roads, bridges, and river improvements . . . regularly provided for a compensation scheme." James W. Ely Jr., *"All Temperate and Civilized Governments"; A Brief History of Just Compensation in the Nineteenth Century*, 10 BRIGHAM-KANNER PROP. RTS. J. 275, 276 (2021) (emphasis added). And when publishing his *Commentaries on the Laws of England* (1765–1769), "Blackstone treated [such] compensation as an established principle of the common law." *Id.*; *see also The Case of the King's Prerogative in Saltpetre* (1606) 77 Eng. Rep. 1294, 1295 (allowing King James VI to seize English salt mines for the production of gunpowder, so long as the King's ministers left the "inheritance of the subject in so good plight as they found it").

The colonists looked to both Magna Carta and English common law in defining and establishing their own principles of self-governance. *See Horne*, 576 U.S. at 358–59. But the principle of just compensation was not a universal (or even common) feature of early state constitutions. *See* William Michael Treanor, Note, *The Origins and Original Significance of the Just Compensation Clause of the Fifth Amendment*, 94 YALE L.J. 694, 698 (1985). Indeed, some colonial-era laws expressly disallowed compensation when the state seized privately owned but unimproved land for public use. *See* 1760 N.Y.

Laws 191 (providing compensation only for the seizure of "cleared and improved Lands"); 1750 N.Y. Laws 421 (same for "inclosed or improved lands").[16]

But other very early state and colonial statutes did mandate that the government provide just compensation for the seizure of private property.

> In 1641, for example, Massachusetts adopted its Body of Liberties, prohibiting "mans Cattel or goods of what kinde soever" from being "pressed or taken for any publique use or service, unless it be by warrant grounded upon some act of the generall Court, nor without such reasonable prices and hire as the ordinarie rates of the Countrie do afford." Massachusetts Body of Liberties ¶ 8, in R. Perry, SOURCES OF OUR LIBERTIES 149 (1978). Virginia allowed the seizure of surplus "live stock, or beef, pork, or bacon" for the military, but only upon "paying or tendering to the owner the price so estimated by the appraisers." 1777 Va. Acts ch. XII. And South Carolina authorized the seizure of "necessaries" for public use, but provided that "said articles so seized shall be paid for agreeable to the prices such and the like

---

[16] The rejection by some colonists of the principles of just compensation has been identified as reflecting the "reigning ideology" of the Founding era, republicanism, in which "[i]ndividual rights played no more than a secondary role." Treanor, *supra*, at 699. A core tenet of republicanism was the idea that "the state could abridge the property right in order to promote common interests." *Id*. at 700.

> articles sold for on the ninth day of October last."  1779 S.C. Acts § 4.

*Horne*, 576 U.S. at 358–59.

Many States that adopted just compensation requirements did so in response to what Blackstone described as "the arbitrary and oppressive mode of obtaining supplies for the army, and other public uses, by impressment, as was too frequently practised during the revolutionary war, without any compensation whatever."  ST. GEORGE TUCKER, 1 BLACKSTONE'S COMMENTARIES, note D, at 305–06 (1803).  In 1778, John Jay publicly denounced "the Practice of impressing Horses, Teems, & Carriages by the military, without the Intervention of a civil Magistrate, and without any Authority from the Law of the Land."  1 JOHN JAY, *A Hint to the Legislature of the State of New York, [Jan. 15, 1778–Apr. 2, 1778] in* THE SELECTED PAPERS OF JOHN JAY, 503–05 (Elizabeth M. Nuxoll ed., 2010).[17]

Against this backdrop, James Madison authored the Takings Clause animated by concerns that although the rights of property had been "for obvious reasons, unattended to in the commencement of the Revolution," "more correct ideas on th[e] subject" required that the government expressly safeguard those rights.  Treanor, *supra*, at 709 (quoting James Madison, *Observations on Jefferson's Draft of a Constitution of Virginia* (Oct. 15, 1788), *reprinted in* 8 THOMAS JEFFERSON, THE PAPERS OF THOMAS JEFFERSON 308, 310 (Julian P. Boyd ed., 1953)).  The Takings Clause, as enacted, provided: "[N]or shall private property be taken

---

[17] These uncompensated seizures contributed to a broader societal trend towards "liberalism" and its emphasis on "individual rights— particularly property rights."  Treanor, *supra*, at 701, 704.

for public use, without just compensation."**[18]**  U.S. CONST. amend. V.

Following independence, States themselves remained divided over the principle of just compensation.  Vermont's 1786 constitution, for example, established that while "private property ought to be subservient to public uses . . . whenever any particular man's property is taken for the use of the public, the owner ought to receive an equivalent in money."  VT. CONST. ch. I, art. II (1786); *see also* 1777 Va. Acts ch. XII (allowing the government to seize surplus "live stock, or beef, pork, or bacon" upon "paying or tendering to the owner the [estimated] price").  In both Pennsylvania and South Carolina, however, courts held that the government's seizure of unimproved land did *not* entitle landowners to just compensation.  *See, e.g.*, *M'Clenachan v. Curwen*, 6 Binn. 509, 511, 516 (Pa. 1802) (denying compensation for the building of a road across unimproved

---

[18] Madison's original proposal for the Takings Clause reflects a greater concern with the government's direct physical seizure of property than the language ultimately adopted: "No person shall be . . . obliged to *relinquish* his property, where it may be necessary for public use, without a just compensation."  12 JAMES MADISON, *Amendments to the Constitution, [8 June] 1789*, THE PAPERS OF JAMES MADISON, 2 MARCH 1789–20 JANUARY 1790 AND SUPPLEMENT 24 OCTOBER 1775–24 JANUARY 1789, 196–210 (Charles F. Hobson & Robert A. Rutland, eds. 1979) (emphasis added).  We know of nothing in the historical record explaining the departure from this wording of the Takings Clause.  Madison's introduction of the Takings Clause has been described as "sua sponte," and there is no recorded debate on the meaning, scope, or interpretation of the Takings Clause at the time of its adoption.  David J. Wenthold, Comment, Murr *and Wisconsin: The Badger State's Take on Regulatory Takings*, 102 MARQ. L. REV. 261, 267 (2018); *see also* Treanor, *supra*, at 711 (arguing that Madison "intended the clause to apply only to direct, physical taking of property by the federal government").

land in colonial Pennsylvania); *Lindsay v. East Bay St. Comm'rs*, 2 S.C.L. (2 Bay) 38, 47–51, 62 (1796) (denying compensation for the seizure of unimproved land in colonial South Carolina because the judges were "equally divided").

As this history shows, the principle of just compensation was irregularly adopted by various state and colonial legislatures and courts, both preceding and during the Founding era.  But Pena cites no Founding-era examples— and we could find none—of either states or the federal government establishing that the state's destruction of property out of necessity in the defense of public safety required (or even warranted) the payment of just compensation.  And when the historical record does not support the scope of a constitutional claim as alleged, "[t]he absence" of such support is itself "weighty evidence" counseling against the expansion of constitutional claims. *Culley v. Marshall*, 601 U.S. 377, 392 (2024).

And when contemplating governmental takings in the context of defending public safety, at least one Founding-era state supreme court held that the colonial government's seizure of property in the defense of public safety did *not* constitute a taking.  *Respublica v. Sparhawk*, 1 Dall. 357 (Pa. 1788), is a pre-Takings Clause case that addressed the common law right to just compensation at the time of the Founding.[19]  There, the Pennsylvania Supreme Court held that just compensation was not warranted for the colonial

---

[19] We find *Sparhawk* particularly persuasive given that, as discussed further below, the Supreme Court has repeatedly cited *Sparhawk* for the principle that the government's *destruction* of private property in wartime does not warrant just compensation. *See, e.g.*, *United States v. Caltex*, 344 U.S. 149, 154 & n.6 (1952); *United States v. Pac. R.R.*, 120 U.S. 227, 234 (1887).

government's seizure of private property during the Revolutionary War. *Id*. at 363. The *Sparhawk* plaintiff specifically sought compensation for flour seized by the government "in order to prevent its falling into the hands of the enemy." *Id*. at 360. As the Pennsylvania Supreme Court reasoned, "Congress might lawfully direct the removal of any articles that were necessary to the maintenance of the Continental army, or useful to the enemy . . . for they were vested with the powers of peace and war" without providing compensation for such seizure. *Id*. at 363. In other words, no compensation was due because the seizure of the relevant property was, as here, undertaken by the State in the defense of public safety. *See also id*. ("In time of war, bulwarks may be built on private ground . . . because it is for the public safety.").

Indeed, this understanding of the relationship between the government's need to protect public safety and the principle of just compensation predates the Founding. Emmerich de Vattel's *The Law of Nations*—first published in 1758—discussed how:

> The sovereign, indeed, ought to shew an equitable regard for the sufferers, if the situation of his affairs will admit of it: but *no action lies against the state for misfortunes of this nature*,—for losses which she has occasioned, not willfully, but through necessity and by mere accident, in the exertion of her rights. The same may be said of damages caused by the enemy. All the subjects are exposed to such damages: and woe to him on whom they fall! The members of a society may well encounter such risk of

> property, since they encounter a similar risk of life itself. Were the state strictly to indemnify all those whose property is injured in this manner, the public finances would soon be exhausted; and every individual in the state would be obliged to contribute his share in due proportion,—a thing utterly impracticable.

Emmerich de Vattel, THE LAW OF NATIONS 403 (London, G.G. and J. Robinson ed. 1797) (emphasis added).

Although Vattel understood damages "done deliberately and by way of precaution" as within the scope of just compensation, he distinguished those damages from the destruction of property which occurs "through necessity and by mere accident, in the [State's] exertion of her rights." *Id*. at 402–03. Here, the destruction of Pena's property occurred through necessity. Once Pena's property had been seized by a hostile force outside the City's control—an armed fugitive—the City was *required* to act. Its failure to do so would have represented an abdication of its role as the defender of public safety, which the Supreme Court has described as the "paramount governmental interest." *Scott v. Harris*, 550 U.S. 372, 383 (2007).

### c. Takings Clause Jurisprudence Since the Founding

Takings Clause jurisprudence since the Founding provides no support for Pena's position. Since 1791, the Supreme Court has held that the Takings Clause covers certain circumstances in which the government overrides various types of private property rights in service of the public good. These include the government's flooding of private property, *see Pumpelly v. Green Bay & Miss. Canal*

*Co.*, 80 U.S. 166, 179–81 (1871);[20] the government's formal condemnation of property, *see United States v. Gen. Motors Corp.*, 323 U.S. 373, 374–80, 384 (1945); and the government's imposition of regulations requiring property owners to admit union organizers onto their lands, *see Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149–52 (2021). The Supreme Court has also identified the concept of "regulatory" taking[s]", in which government regulations go "too far" and thus deprive property owners of their property rights. *See Horne*, 576 U.S. at 360 (quoting *Pa. Coal Co. v. Mahon,* 260 U.S. 393, 415 (1922)).

But the Supreme Court has never held that the State's reasonable and necessary destruction of property under its police power constitutes a compensable taking. The

---

[20] Pena cites *Pumpelly* as establishing that the government's absolute destruction of property always constitutes a taking under the Takings Clause. Certain judges of our sister courts have agreed with this position. *See Baker v. City of McKinney*, 93 F.4th 251, 252 (5th Cir. 2024) (Elrod & Oldham, JJ., dissenting from denial of rehearing en banc) (citing *Pumpelly* for the proposition that "[i]t has been settled law for over 150 years that the destruction of property constitutes a taking"). We decline to endorse this position: first, the *Pumpelly* Court was construing the Wisconsin Constitution. 80 U.S. at 176–77. The *Pumpelly* Court also noted:

> We are not unaware of the numerous cases in the State courts in which the doctrine has been successfully invoked that for a consequential injury to the property of the individual arising from the prosecution of improvements of roads, streets, rivers, and other highways, for the public good, there is no redress; and we do not deny that the principle is a sound one, in its proper application, to many injuries to property so originating.

*Id*. at 180–81.

Supreme Court has also acknowledged that not all government actions infringing on property rights are takings, including because of the history discussed above:

> [M]any government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights . . . .
>
> These background limitations . . . encompass traditional common law privileges to access private property. One such privilege allowed individuals to enter property in the event of public or private necessity. *See* RESTATEMENT (SECOND) OF TORTS § 196 (1964) (entry to avert an imminent public disaster); § 197 (entry to avert serious harm to a person, land, or chattels).

*Cedar Point*, 594 U.S. at 160–61.

In addition to the common law right to *enter* private property, the common law has long recognized a "necessity" privilege for the destruction of private property. As the Supreme Court identified in 1879:

> At the common law every one had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire, and there was no responsibility on the part of such destroyer, and no remedy for the owner. In the case of the Prerogative, 12 Rep. 13, it is said: 'For the Commonwealth a man shall suffer damage, as for saving a city

> or town a house shall be plucked down if the
> next one be on fire; and a thing for the
> Commonwealth every man may do without
> being liable to an action.' There are many
> other cases besides that of fire,—some of
> them involving the destruction of life
> itself,—where the same rule is applied. 'The
> rights of necessity are a part of the law.'

*Bowditch v. Boston*, 101 U.S. 16, 18 (citing *Sparhawk*, 1
Dall. at 362). In short, the necessity privilege's "basis in
history and tradition is longstanding and long recognized."
*Baker*, 84 F.4th at 387.

And for more than two centuries, the Supreme Court has
continued to invoke *Sparhawk*'s principle that "in times of
imminent peril . . . the sovereign could, with immunity,
destroy the property of a few that the property of many and
the lives of many more could be saved." *United States v.
Caltex*, 344 U.S. 149, 154 & n.6, 156 (1952) (citing
*Sparhawk* and holding that the destruction of plaintiffs'
property during World War II was exempt from the scope of
the Takings Clause); *see also United States v. Pac. R.R.*, 120
U.S. 227, 239 (1887) (holding that "the government [could
not] be charged for injuries to, or destruction of, private
property caused by military operations of armies in the field"
during the Civil War).[21] "Indeed, [at the time of the

---

[21] The concurrence distinguishes these cases from the present suit
because the former both involve destruction of property during war.
Concurrence at 35–37. However, the Supreme Court's reasoning in
these cases is not limited to the wartime context. In *Pacific Railroad*,
the Supreme Court quoted with approval President Grant's statement that
there is no "legal obligation . . . to compensate the owner" when property
is "temporarily occupied, or even actually destroyed, in times of great

Founding,] it was [the commanding general's] imperative duty to direct the[] destruction" of private property in warmaking, if doing so advanced the objectives of winning the war. *Caltex*, 344 U.S. at 153–54 (quoting *Pac. R.R.*, 120 U.S. at 234). This destruction has been exempted from the scope of the Takings Clause because "[t]he *safety of the state* in such cases overrides all considerations of private loss." *Id*. (quoting *Pac. R.R.*, 120 U.S. at 234) (emphasis added).

These cases specifically discuss private property destruction during wartime. While there are obvious distinctions between the government's exercise of its wartime powers and the actions of domestic law enforcement, this does not mean that the Supreme Court's treatment of the Takings Clause in the wartime context provides us with no meaningful guidelines in the circumstances before us. The rationale of *Sparhawk*, adopted by the Supreme Court in *Caltex* and *Pacific Railroad*, is directly applicable to Pena's situation, as in *Caltex* and *Pacific Railroad*, the Supreme Court addressed the Government's destruction of private property through state actions taken to further public safety—the same circumstances present here.

---

public danger, and when the public safety demands it" and that the "destruction of property, caused by actual and necessary military operations, is generally considered *to fall within* the last-mentioned principle." 120 U.S. at 238 (emphasis added) (quoting Cong. Globe, 42d Cong. 2d Sess. 4155–56 (1872)). Similarly, in *Caltex*, the Supreme Court noted that "the principles expressed" in *Pacific Railroad* "were neither novel nor startling, for the common law had long recognized that in times of imminent peril—*such as when fire threatened a whole community*—the sovereign could, with immunity, destroy the property . . . ." 344 U.S. at 154 (emphasis added).

Finally, although the question of practical consequences is distinct from the question we address here, we note that the Supreme Court has considered the practical consequences of expanding the Takings Clause when determining its scope. *See, e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 544 (2005) (identifying defendant's theory of takings not only as "*doctrinally* untenable" but also as presenting "serious practical difficulties"); *Nat'l Bd. of Young Men's Christian Ass'ns v. United States*, 395 U.S. 85, 92 (1969) (identifying the pragmatic concern that under petitioners' conception of takings, "governmental bodies would be liable . . . every time policemen break down the doors of buildings to foil burglars thought to be inside").

Expanding the scope of the Takings Clause as Pena envisions it would cover essentially all government destruction of private property, including when ambulances carrying patients sideswipe private vehicles; errant bullets break store windows in firefights with criminal suspects; and police commit *any* form of property damage in pursuit of criminal suspects, no matter how reasonable, lawful, or necessary as part of the State's duty to protect public safety and save the lives of its citizens.

The practical consequences of adopting Pena's view would be that law enforcement officers (and other government actors) faced with split-second decisions regarding protecting the public and saving lives would need to be constantly attendant to the potential *financial* consequences of their actions. In real and practical terms, this would improperly interfere with the State's primary obligation to protect public safety.

### d. **Firefighting and Necessity**

The history of takings jurisprudence in the context of fire management complicates our analysis. When the government destroys private property as part of its firefighting duties, it has done so out of necessity. And some State courts in the nineteenth century found such necessary destruction constitutes a taking requiring just compensation. *See, e.g.*, *Bishop & Parsons v. City of Macon*, 7 Ga. 200, 202 (1849) (holding that it is "well settled, that in a case of actual necessity, to prevent the spreading of a fire, the ravages of a pestilence, the advance of a hostile army, or any other great public calamity, the private property of an individual may be *lawfully* taken, and used or destroyed for the relief, protection or safety of the many. And . . . the sufferers are nevertheless entitled, under the Constitution, to just compensation from the public for the loss"); *Hale v. Lawrence*, 21 N.J.L. 714, 739 (1848). Other State courts disagreed. *See Am. Print Works v. Lawrence*, 23 N.J.L. 590, 594 (1851); *Field v. City of Des Moines*, 39 Iowa 575, 583, 587 (1874) (collecting cases); *see also McDonald v. City of Red Wing*, 13 Minn. 38, 41–42 (1868). Moreover, the Supreme Court's reasoning in Takings Clause cases suggests that such destruction does not always constitute a compensable taking. *See Bowditch*, 101 U.S. at 16, 18 (holding the "city . . . not responsible to the owner of buildings . . . which are destroyed in order to prevent the spreading of a fire, unless a joint order for their destruction be given by three or more engineers of the fire department," and identifying that "[a]t the common law every one had the right to destroy real and personal property, in cases of actual necessity, to prevent the spreading of a fire, and there was no responsibility on the part of such destroyer, and no remedy for the owner"); *see also Lucas v. S.C.*

*Coastal Council*, 505 U.S. 1003, 1029 & n.16 (1992) (identifying the State's "complementary power" to destroy "'real and personal property, in cases of actual necessity, to prevent the spreading of a fire' or to forestall other grave threats to the lives and property of others" (quoting *Bowditch*, 101 U.S. at 18–19)).   In sum, the weight of judicial authority respecting takings in the firefighting context supports our holding that no compensable taking occurs when the government destroys private property in the course of necessary and reasonable exercise of the police power to protect public safety.**[22]**

### e.  **Alternative Remedies at the State and Municipal Level**

We are cognizant of the Supreme Court's description of the Takings Clause as "designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). But the Takings Clause is not the only recourse for individuals in Pena's position: any injustice in such cases may be addressed through legislative or administrative remedies, or through more expansive corollaries to the Takings Clause in State constitutions.   Municipalities may

---

[22] We have not directly addressed whether the destruction of private property by the government while fighting fires is compensable under the Takings Clause.   However, we have found that a fire crew's decision to set a backfire on private property while fighting oncoming fires falls within the discretionary function exception to the Federal Tort Claims Act, thus barring claims for damages under the Act based on damage caused by the backfire.  *See Esquivel v. United States*, 21 F.4th 565, 576 (9th Cir. 2021).

also possess the authority to resolve any perceived injustices that arise in circumstances akin to those here.

*        *        *

The reckless actions of a fugitive and, consequently, the necessary and reasonable actions of law enforcement officers caused Pena to suffer a personal loss.  The Takings Clause, however, provides Pena no remedy.  As understood at the time of the Founding, and as centuries of precedent confirm, when law enforcement officers destroy or damage private property in the necessary and reasonable defense of public safety, such destruction is exempt from the scope of the federal Takings Clause.  Pena therefore fails to state a Takings Clause claim under the U.S. Constitution.

**AFFIRMED**.

FRIEDLAND, Circuit Judge, concurring in the judgment:

Although I agree with the majority that Pena does not state a Takings Clause claim, I would reach that conclusion for a different reason.  As the Supreme Court has instructed, before analyzing whether compensation for a taking of property is required by history and tradition, we must begin with the "logically antecedent inquiry" into whether property has been taken at all.  *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992).  Following that methodology, I would hold that the Los Angeles police's actions fell under the search-and-arrest privilege that serves as a background limitation on all property rights, including

Pena's here, so no property right was infringed at all and, accordingly, no compensation is owed.[1]

"[B]efore deciding whether the government has taken a property interest, we first must determine whether any property interest exists." *S. Cal. Edison Co. v. Orange Cnty. Transp. Auth.*, 96 F.4th 1099, 1104 (9th Cir. 2024), *cert. denied*, 145 S. Ct. 1310 (2025). In *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), the Supreme Court explained that takings jurisprudence "has traditionally been guided by the understandings of our citizens regarding the content of, and the State's power over, the 'bundle of rights' that they acquire when they obtain title to property." *Id.* at 1027. The Court further explained in *Cedar Point Nursery*

---

[1] The majority argues that *Customer Co. v. City of Sacramento*, 895 P.2d 900 (Cal. 1995) forecloses this result. Maj. Op. at 7 n. 5. I disagree. It is true that the California Supreme Court described the plaintiff—who experienced similar law enforcement conduct to Pena—as a "property owner," and resolved the issue on the scope of the state constitution rather than on the scope of property rights. *Id.* at 915. But the California Supreme Court had no obligation to follow *Lucas*'s instruction about which question is antecedent. And the California Supreme Court's language suggests that it was using the word "property" to refer to material or tangible objects rather than to the rights of an owner (or limits thereon) . *Property*, Black's Law Dictionary (12th ed. 2024) (describing how the word "property" can refer to multiple concepts, including "the rights in a valued resource such as land, chattel, or an intangible . . . a 'bundle of rights,'" or an "external thing over which the rights of possession, use, and enjoyment are exercised"); Wesley Newcomb Hohfeld, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L. J. 16, 21-22 (1913) ("Frequently there is a rapid and fallacious shift from the one meaning [of property] to the other. At times, also, the term is used in such a 'blended' sense as to convey no definite meaning whatever."). As I read it, the court did not reckon in *Customer Co.* with the scope of background restrictions on property rights.

*v. Hassid*, 594 U.S. 139 (2021), that "many government-authorized physical invasions will not amount to takings because they are consistent with longstanding background restrictions on property rights." *Id.* at 160. The Court noted that those background restrictions "encompass traditional common law privileges to access private property." *Id.* at 160. In other words, if the common law traditionally allows a government-authorized physical invasion, then the owner's property rights do not include the right to prevent that physical invasion, and the invasion therefore cannot constitute a taking of property without just compensation.

As one example of a traditional common law privilege that limits property rights, the Supreme Court in *Cedar Point* cited the privilege "to enter property to effect an arrest or enforce the criminal law under certain circumstances." *Id.* at 161. The Court explained that an entry of that type would not be a taking, provided that the entry is reasonable and consistent with the Fourth Amendment and state law, because "a property owner traditionally had no right to exclude an official engaged in" such conduct. *Id.* The entry therefore "cannot be said to take any property right from landowners." *Id.*

Courts have recognized that common law search-and-arrest privilege for more than two centuries. Early state court cases, for example, held that police officers who conducted searches or arrests pursuant to valid warrants were not liable to property owners for any resulting damage. *See, e.g.*, *Sandford v. Nichols*, 13 Mass. 286, 288-89 (1816) (explaining that if officers forcibly entered the plaintiff's home under a lawful warrant, they would not be liable for trespass); *Bell v. Clapp*, 10 Johns. 263, 265-66 (N.Y. Sup. Ct. 1813) (per curiam) (holding that officers executing a valid search warrant who forcefully opened the door to a

home and seized stolen goods "in as peaceable a manner as possible" were not liable for trespass); *Kelsy v. Wright*, 1 Root 83, 84 (Conn. Super. Ct. 1783) (holding that an officer who had a valid warrant to arrest a fugitive was not liable for breaking down the fugitive's door and entering his house where the officer had "good reason" to believe that the fugitive was inside); *see also Slaybaugh v. Rutherford County*, 114 F.4th 593, 599-601 (6th Cir. 2024) (discussing the history of the search-and-arrest privilege), *cert. denied*, 145 S. Ct. 1959 (2025).

The Restatement (Second) of Torts accordingly recognizes the privilege "to enter land in the possession of another" to make an arrest for a criminal offense, recapture a person previously arrested, or prevent someone from committing a serious crime. Restatement (Second) of Torts §§ 204-205 (Am. L. Inst. 1965). That privilege carries with it the privilege to break and enter a building and use force against others, if reasonably believed to be necessary. *Id.* §§ 212-213.

The search-and-arrest privilege, however, does not exempt all police searches and arrests from liability. As *Cedar Point* and the common law recognize, the search and arrest must be lawful (including under the Fourth Amendment). *See Cedar Point*, 594 U.S. at 161; Restatement (Second) of Torts § 204 cmt. g. And the officers conducting the search and arrest must "reasonably believe[]" that the person sought is on the land being entered. Restatement (Second) of Torts § 204. Further, officers may be liable for damage to property if they "unreasonably exercise[]" the privilege by intentionally or negligently causing unnecessary harm to the land or chattels on it. *Id.* §§ 214 cmt. a, 204 cmt. g; *see also United States v. Ramirez*, 523 U.S. 65, 71 (1998) ("Excessive or unnecessary

destruction of property in the course of a search may violate the Fourth Amendment.").

The police's intrusion on Pena's shop falls within the search-and-arrest privilege and thus within a "pre-existing limitation" on Pena's property rights. *Lucas*, 505 U.S. at 1028. Pena alleges that after the fugitive had barricaded himself in Pena's shop, the police sought to capture and arrest the fugitive by firing tear gas canisters into the shop in an attempt to subdue him before they eventually entered the shop. The police's entry to Pena's land is thus plainly an entry to make an arrest for a criminal offense. *See* Restatement (Second) of Torts § 204. And Pena does not dispute that the police's entry was lawful, or that the police's actions (including the destruction of his shop equipment) were reasonable and necessary for the purpose of arresting the fugitive. I would therefore rely on the privilege to reject Pena's claim at the first step of the analysis, holding only that the background restriction on property rights means no taking occurred.

The majority frames its public safety exception as falling within the necessity exception that courts have long understood as limiting the Takings Clause, but the cases the majority relies upon did not actually create an exception for circumstances like Pena's. The majority relies heavily on *Respublica v. Sparhawk*, 1 U.S. (1 Dall.) 357 (Pa. 1788), which held that Congress did not owe just compensation for seizing flour to prevent it from falling into enemy hands during the Revolutionary War. *Id.* at 363. The court in *Sparhawk* emphasized, however: "The transaction, it must be remembered, happened flagrante bello [during a state of war]; and many things are lawful in that season, which would not be permitted in a time of peace. The seizure of the property in question, can, indeed, *only be justified under*

*this distinction*." *Id.* at 362 (emphasis added). *Sparhawk* thus expressly relied on the fact that the country was in a state of war, and the government's uncompensated seizure of private property was justified only by its need to protect the property from enemy forces. And the only Supreme Court cases I am aware of that have followed *Sparhawk*'s reasoning—and the only ones cited by the majority—also originated in wartime contexts. *See United States v. Caltex (Philippines), Inc.*, 344 U.S. 149, 155 (1952) (holding that the government was not required to pay for oil terminals destroyed during a military invasion because doing so was necessary to prevent the enemy from gaining any strategic value from them); *United States v. Pac. R.R.*, 120 U.S. 227, 234 (1887) (explaining that "[f]or all injuries and destruction which followed necessarily" from the Civil War armies' operations, "no compensation could be claimed from the government"). I do not think those cases established a general public safety exception that would apply to the actions of domestic law enforcement here, which were undertaken in a time of peace to protect against a domestic criminal.[2] By contrast, the search-and-arrest privilege is already well-enumerated in common law and Fourth Amendment doctrine, so its application in the Takings Clause context would be clear. *See Slaybaugh*, 114 F.4th at 604 (explaining that the search-and-arrest privilege "is rooted in the common law, has been long recognized in our

---

[2] The passage from Emmerich de Vattel's *The Law of Nations*, upon which the majority relies, was also clearly focused on wartime. The excerpted paragraph begins with a question, "Is the state bound to indemnify individuals *for the damages they have sustained in war*?" and falls within a chapter discussing the "Right of Private Persons in War." Emmerich de Vattel, *The Law of Nations* 402 (London, G.G. and J. Robinson ed. 1797) (emphasis added), https://babel.hathitrust.org/cgi/pt?id=hvd.32044105475818&seq=500.

court system as a defense to trespass claims, and maps neatly onto our caselaw holding that persons who suffered an unreasonable search or seizure may be entitled to damages under the Fourth Amendment").

Recognizing the search-and-arrest privilege as a background limitation on property rights also does not conflict with the Taking Clause's overarching purpose "to bar *Government* from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960) (emphasis added). Here, it was not the government's choice to select Pena's store as the place the fugitive would hide and need to be arrested. Instead, the fugitive chose Pena's store to hide in, and the police responded to the crime without making a choice that Pena should incur the costs of the arrest. In that sense, it was the fugitive who forced Pena to bear a public burden, not the government—and, again, Pena has not argued that the police's actions were unreasonable or unnecessary to effect the arrest once the fugitive was inside the store.

I offer two additional thoughts on the methodological differences between my concurrence and the majority. First, relying on background limitations on property rights correctly places the burden on the government to demonstrate the existence of such limits, not on the plaintiff to show historical examples of compensation in similar circumstances. *See Lucas*, 505 U.S. at 1031 (describing how on remand, "*South Carolina* must identify background principles of nuisance and property law" (emphasis added)). Yet the majority, citing a case discussing the Due Process Clause rather than the Takings Clause, penalizes the plaintiff for history's silence. Maj. Op. at 21 (citing *Culley v. Marshall*, 601 U.S. 377, 392 (2024)).

Second, a focus on background limitations on property rights allows the Takings Clause to account for evolving realities of property ownership.  History and precedent are of course essential to understanding the Takings Clause, but the focus of Takings Clause analysis is on the scope of property rights as they existed at the time the owner acquired title to the property that was allegedly taken.  *Lucas*, 505 U.S. at 1029 (describing how a background restriction must "inhere in the title itself").  Focusing too heavily on just compensation at the Founding could cause courts to fail to recognize that the Takings Clause does not bind us to any one era's understanding of "property."

Because I agree with the majority that Pena fails to state a takings claim but think that the search-and-arrest privilege would be a better-supported and more straightforward ground on which to dismiss the claim, I concur only in the judgment.